WAGNER, Admr., Appellant,

v.

HEAVLIN et al., Appellees.

[Cite as *Wagner v. Heavlin* (2000), 136 Ohio App.3d 719.]

Court of Appeals of Ohio,
Seventh District, Carroll County.

No. 704.

Decided Feb. 14, 2000.

722

*Stanley R. Rubin* and *Lawrence E. Chapanar,* for appellant.

*John T. McLandrich* and *Deborah W. Yue*; *Mark F. Fischer* and *Cari Fusco Evans*; *Donald R. Burns, Jr.,* Carrollton Village Solicitor, for appellees.

---

GENE DONOFRIO, Judge.

Ronald K. Wagner, Administrator of the Estate of Christopher J. Wagner, plaintiff-appellant, appeals from an order of the Carroll County Court of Common Pleas granting summary judgment in favor of Timothy D. Heavlin et al., defendants-appellees.

On October 1, 1995, at approximately 1:00 a.m., Christopher J. Wagner and Callie Stephenson were in the downtown area of the village of Carrollton, Ohio. A friend of Wagner's had lent him the key to his motorcycle. Officer Timothy Heavlin, a Carrollton police officer, was assisting with emptying parking meters when he saw Wagner and Stephenson approach the motorcycle. Officer Heavlin warned Wagner not to operate the motorcycle unless his driving privileges had been reinstated.

After unsuccessful attempts to obtain a ride home, Wagner and Stephenson approached the motorcycle again. They both got on the motorcycle, Wagner as driver and Stephenson seated behind him. Officer Heavlin observed this and pulled behind Wagner at a red light at the intersection of Lisbon and Main Street. Officer Heavlin activated the overhead lights of his cruiser. As Officer Heavlin began to exit his vehicle and approach the motorcycle, Wagner accelerated away.

Officer Heavlin pursued Wagner south on State Route 332. The pursuit continued on State Route 332 as they proceeded outside the village limits at speeds reaching between sixty-five to seventy miles per hour. Wagner then turned onto State Route 164. As the pursuit continued on State Route 164, Wagner began to go left of center as they went into a downhill, right-hand turn. The motorcycle continued across the road crashing into a guardrail. Stevenson hit the guardrail and was thrown aside. Officer Heavlin began to brake but was unable to stop his cruiser before running over Wagner and crashing into the motorcycle and guardrail. Officer Heavlin exited his cruiser and discovered Wagner underneath. Wagner was pronounced dead at the scene.

On May 6, 1996, appellant filed a complaint for wrongful death against appellees. Appellant voluntarily dismissed the case on March 27, 1997, pursuant to Civ.R. 41(A)(1), without prejudice.

On September 24, 1997, appellant filed a civil action in the United States District Court, Northern District of Ohio, against the same appellees, asserting "civil rights violations and other torts." Appellant asserted federal claims under Section 1983, Title 42, U.S. Code, as well as a state law claim for wrongful death under R.C. Chapter 2125. On June 8, 1998, the federal district court, relying in part on the United States Supreme Court decision in *Cty. of Sacramento v. Lewis* (1998), 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043, granted appellees' motion for summary judgment as to appellant's federal claims. The court dismissed appellant's state-law claim for wrongful death without prejudice.

On June 12, 1998, appellant refiled his complaint, previously dismissed without prejudice, with the Carroll County Court of Common Pleas. Appellees filed a motion for summary judgment on July 30, 1998. Appellant responded with a motion in opposition on August 31, 1998. On November 3, 1998, the trial court granted appellees' motion for summary judgment. This appeal followed.

Appellant assigns as error the trial court's granting of appellees' motion for summary judgment motion and posits the following five separate issues for review:

"(1) Whether issues of fact exist as to appellee village of Carrollton's immunity from liability under R.C. Chapter 2744.

"(2) Whether issues of fact exist as to whether appellee Heavlin was responding to an emergency call.

"(3) Whether issues of fact remain as to the wantonness or willfulness of appellee Heavlin's misconduct.

"(4) Whether issues of fact exist as to the willful or wanton misconduct of the village of Carrollton.

"(5) Whether appellee Heavlin's conduct was a bar to a grant of summary judgment based on immunity."

## I Summary Judgment Standard of Review

An appellate court reviews a trial court's decision on a motion for summary judgment *de novo*. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245. Summary judgment is properly granted when "(1) * * * there is no genuine issue as to any material fact; (2) * * * the moving party is entitled to judgment as a matter of law; and (3) * * * reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47; Civ.R. 56(C).

"[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." (Emphasis *sic*.) *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274

The portions of the record or evidentiary materials listed in Civ.R. 56(C) include the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any," that have been filed in the case. The court is obligated to view all the evidentiary material in a light most favorable to the nonmoving party. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

"If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial

burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Dresher*, 75 Ohio St.3d at 293, 662 N.E.2d at 274.

## II The Village's Vicarious Liability for the Acts/Omissions of Officer Heavlin

The crux of appellees' motion for summary judgment was that they were entitled to governmental tort immunity. Determining whether a political subdivision is immune from liability entails a three-tier analysis. *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610, 614–615. The first tier is simply a statement of the general rule that political subdivisions are immune from tort liability. Specifically, R.C. 2744.02(A)(1) provides in relevant part:

*"Except as provided in division (B) of this section,* a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." (Emphasis added.)

At the second tier, immunity can be removed under any one of five exceptions to immunity. The immunity afforded to political subdivisions under R.C. 2744.02(A)(1), by its express terms, is subject to the five exceptions listed in R.C. 2744.02(B).

At the third tier, immunity can be reinstated if the political subdivision can successfully argue an available defense. The exceptions set forth in R.C. 2744.02(B), by its express terms, are subject to the defenses listed in R.C. 2744.03.

Before turning to an application of the three-tiered analysis to this case, it is important to note that, at this point, we are only examining the vicarious liability of the village for the acts and/or omissions of its employee, Officer Heavlin. The village's direct liability for its own acts and/or omissions will be discussed *infra*.

■ We begin at the first tier with the general rule that the village, as a political subdivision, is immune from tort liability for the acts and/or omissions of its employee, Officer Heavlin, in connection with a governmental or proprietary function.

At the second tier, the only exception to liability that presents itself as relevant to this case is R.C. 2744.02(B)(1). That section provides in relevant part:

"Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation

of any motor vehicle by their employees upon the public roads when the employees are engaged within the scope of their employment and authority. * * * ”

For reasons that are more fully addressed in our discussion of appellees' asserted defense, Officer Heavlin's operation of the patrol car, at the very least, amounted to negligent conduct. Therefore, we move to the third tier of analysis.

R.C. 2744.02(B)(1) continues:

“ * * * The following are full defenses to that liability:

“(a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct.”

The exception in R.C. 2744.02(B)(1) is unique in that a special defense is found within the exception itself rather than in R.C. 2744.03, where the general defenses are found. Appellees raised this defense arguing that Officer Heavlin was responding to an emergency call and that the operation of the vehicle did not constitute willful or wanton misconduct. This special defense, found in R.C. 2744.02(B)(1)(a), focuses specifically and only on the conduct of the officer at the time of the pursuit.

Thus, the full defense provided for political subdivisions under R.C. 2744.02(B)(1)(a) reduces the liability of appellees herein to a two-step analysis. First, we must determine whether Officer Heavlin was operating his patrol car while responding to an emergency call. Otherwise, general negligence principles apply. Second, we must determine if Officer Heavlin's operation of his patrol car constituted willful or wanton misconduct.

A. *Emergency Call*

 Citing *Horton v. Dayton* (1988), 53 Ohio App.3d 68, 558 N.E.2d 79, appellant contends that “[t]he issue of whether a police officer is responding to an emergency call is a question of fact which *precludes* the grant of summary judgment.” (Emphasis added.) Appellant grossly misinterprets *Horton*. Just because a particular element of a claim or defense involves a question of fact does not automatically preclude the claim or defense from a determination under summary judgment. The inquiry under summary judgment is whether the moving party has demonstrated the absence of a genuine issue of material fact and, if so, whether the nonmoving party has responded with evidence demonstrating the existence of a genuine issue of material fact. In *Horton*, the court found that the nonmoving parties had presented sufficient evidence, when viewed in a light most favorable to them, that would support an inference that the officer was

not responding to an emergency call at the time of the collision. Since the nonmoving parties had met their reciprocal burden of demonstrating the existence of a genuine issue of material fact, summary judgment was improper. The court did not suggest that the issue of whether a police officer is responding to an emergency call is *always* a question of fact, which automatically precludes the grant of summary judgment.

R.C. 2744.01(A) defines an "emergency call" as "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer."

Appellees argue that Officer Heavlin's suspicion that Wagner was operating the motorcycle without a valid driver's license, combined with Wagner's act of fleeing, was sufficient to constitute an emergency call. Appellees cite *Rodgers v. DeRue* (1991), 75 Ohio App.3d 200, 598 N.E.2d 1312, in support.

In *Rodgers*, plaintiff-appellant, Louis W. Rodgers, was a passenger in an automobile driven by defendant, Robert C. DeRue, who was being pursued in a high-speed chase by defendant-appellee Ferrell, a police officer employed by the village of South Russell. Officer Ferrell observed DeRue's vehicle traveling down the center of the road at a high rate of speed. In order to avoid a head-on collision, Officer Ferrell pulled his police car to the side of the road. Officer Ferrell then turned around, activated his car's emergency lights and siren, and began to pursue the DeRue vehicle, which he clocked at eighty miles per hour. The pursuit ended when DeRue lost control of his vehicle and crashed into an embankment, injuring Rodgers.

Rodgers brought suit against various parties including Officer Ferrell and the village. The trial court granted Officer Ferrell and the village summary judgment based upon governmental tort immunity. Rodgers appealed.

On appeal, one of the issues was whether reasonable minds could differ on whether Officer Ferrell was responding to an emergency call. Interpreting and applying the definition of emergency call as found in R.C. 2744.01, the court found as follows:

"The evidence is uncontroverted that Officer Ferrell personally observed defendant DeRue's vehicle dangerously speeding down the center of the road and that such action created a dangerous situation which required an immediate response by Officer Ferrell. Thus, on its face, Officer Ferrell's pursuit of defendant DeRue's vehicle constituted an 'emergency' as defined by R.C. 2744.01." *Id.*, 75 Ohio App.3d at 203, 598 N.E.2d at 1314

Appellees also cite to *Lewis v. Bland* (1991), 75 Ohio App.3d 453, 456, 599 N.E.2d 814, 815, which observed that "[i]t is the duty of law enforcement officials

who observe reckless motorists to apprehend those motorists who make the highways dangerous [for] others."

Appellant attempts to distinguish *Rodgers* from this case. Appellant argues that in *Rodgers* the high rate of speed was the impetus that generated the dangerous situation demanding an immediate response. Appellant argues that in this case appellees have failed to demonstrate any such impetus. Appellant argues that Heavlin's suspicion, unsupported by specific and articulable facts, that Wagner was operating the motorcycle without a valid driver's license does not rise to the same level of a dangerous situation requiring an immediate response as that presented in *Rodgers*.

■ We decline to adopt appellant's approach that would require that the events preceding the pursuit rise to the level of an inherently dangerous situation demanding an immediate response. To require an inherently dangerous situation to exist before sovereign immunity applies would place an unnecessary chilling effect upon law enforcement's performance of its duties owed to the public. See *Vince v. Canton* (Apr. 13, 1998), Stark App. No. 1997CA00299, unreported, 1998 WL 525570 at *5. Furthermore, the plain language of R.C. 2744.01(A) does not limit the definition of an emergency call to only those occasions where there is an inherently dangerous situation. By focusing on the language "inherently dangerous situations," appellant ignores the fact that R.C. 2744.01(A) defines "emergency call" as "a call to duty, *including, but not limited to,* communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer." (Emphasis added.) In *Moore v. Columbus* (1994), 98 Ohio App.3d 701, 706, 649 N.E.2d 850, 853, the court observed:

" * * * R.C. 2744.01(A) provides but one definition of an 'emergency call' and that definition is the most obvious definition of what would constitute an 'emergency call.' There is no requirement in the statute which would limit an 'emergency call' only to those occasions where there is an inherently dangerous situation or when human life is at danger."

■ Rather than concentrating solely on the events preceding or giving rise to the pursuit, the proper focus should be on all of the attendant facts and circumstances leading up to or giving rise to the pursuit, *including* the operation of the fleeing motorist's vehicle during the pursuit. The evidence is uncontroverted that Officer Heavlin suspected Wagner was operating the motorcycle without a valid driver's license, and that Wagner ran a red light and fled at high speed. Therefore, Heavlin was responding to an emergency call as defined in R.C. 2744.01(A). *Rodgers, supra.*

B. *Willful or Wanton Misconduct*

Citing *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35, appellant asserts that the issue of whether Heavlin's conduct amounted to "willful or wanton misconduct" (R.C. 2744.02[B][1][a]) is a jury question, implying that it is *always* a jury question. However, the Ohio Supreme Court in *Fabrey* held that "the issue of wanton misconduct is *normally* a jury question." (Emphasis added.) *Id.*

Again, as we indicated earlier, just because a particular element of a claim or defense involves a question of fact does not automatically preclude the claim or defense from a determination under summary judgment. The inquiry under summary judgment is whether the moving party has demonstrated the absence of a genuine issue of material fact and, if so, whether the nonmoving party has responded with evidence demonstrating the existence of a genuine issue of material fact. In fact, the court in *Fabrey* affirmed the trial court's granting of summary judgment in favor of the political subdivision based upon governmental tort immunity, precluding the issue from a jury determination.

In *Brockman v. Bell* (1992), 78 Ohio App.3d 508, 514–516, 605 N.E.2d 445, 449–450, the Court of Appeals for Hamilton County provided the following excellent discussion of "willful or wanton misconduct," as it pertains to governmental tort immunity:

"Civil liability for negligence is predicated upon injury caused by the failure to discharge a duty recognized in law and owed to the injured party. The existence of a duty depends on the foreseeability of the injury. The test for foreseeability is whether a reasonably prudent person, under the same or similar circumstances, should have anticipated that injury to another was the probable result of his performance or nonperformance of an act. *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 543 N.E.2d 1188. As the probability increases that certain consequences will flow from certain conduct, the actor's conduct acquires the character of intent and moves from negligence toward intentional wrongdoing. See *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 126, 522 N.E.2d 511, 516 (citing 1 Restatement of the Law 2d, Torts [1965] 15, Section 8A, Comment *b*). Therefore, the terms 'wanton,' 'willful' and 'reckless,' as used to describe tortious conduct, might best be defined at points on a continuum between negligence, which conveys the idea of inadvertence, and intentional misconduct.

"Wanton misconduct is a degree greater than negligence. *Baber v. Dennis* (1979), 66 Ohio App.2d 1, 20 O.O.3d 28, 419 N.E.2d 16. The Ohio Supreme Court has defined 'wanton misconduct' as the failure to exercise any care toward one to whom a duty of care is owed when the failure occurs under circumstances for which the probability of harm is great and when the probability of harm is known

to the tortfeasor. *Matkovich v. Penn Central Transp. Co.* (1982), 69 Ohio St.2d 210, 23 O.O.3d 224, 431 N.E.2d 652; *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367; *Tighe v. Diamond* (1948), 149 Ohio St. 520, 37 O.O. 243, 80 N.E.2d 122.

"Willful misconduct is also something more than negligence and it involves a more positive mental state prompting the injurious act than does wanton misconduct. *Tighe, supra.* The phrase 'willful misconduct' implies intent. However, the intention relates to the misconduct, not to the result, and, therefore, an intent to injure need not be shown. *Id.* The Ohio Supreme Court has defined 'willful misconduct' as 'an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.' *Id.* at 527, 37 O.O. at 246, 80 N.E.2d at 127; see, also, *Napper v. Litchfield* (Sept. 30, 1991), Madison App. No. CA91–02–006, unreported, 1991 WL 194740; *Bedwell v. Physio–Control Corp.* (Jan. 5, 1991), Miami App. No. 89–CA–67, unreported, 1991 WL 1665; *Peoples v. Willoughby* (1990), 70 Ohio App.3d 848, 592 N.E.2d 901.

"The place of reckless misconduct on the continuum is less definite. R.C. 2901.22(C) provides, for purposes of the offenses proscribed in the Criminal Code, that:

" 'A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.'

"This definition of the culpable mental state of recklessness would appear to place reckless misconduct between willful misconduct and intentional wrongdoing. In *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705, however, the Ohio Supreme Court adopted the definition of 'reckless misconduct' set forth in 2 Restatement of the Law 2d, Torts (1965) 587, Section 500, in holding that, between participants in a sporting event, no liability arises for injuries caused by negligence, but liability may be predicated on intentional and, in some instances, reckless misconduct. Section 500 of the Restatement states:

" 'The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'

"Comment $f$ to Section 500 compares recklessness with intentional misconduct, providing that '[w]hile an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it.' *Id.* at 590. Thus, 'reckless misconduct' as defined in Section 500 of the Restatement may be used interchangeably with 'willful misconduct,' *Thompson, supra; Jackson v. Butler Cty. Bd. of Commrs.* (1991), 76 Ohio App.3d 448, 602 N.E.2d 363, and, for purposes of the immunity afforded under R.C. Chapter 2744, 'wanton or reckless' misconduct under R.C. 2744.03(A)(6) may be viewed as the functional equivalent of 'willful or wanton misconduct' under R.C. 2744.02(B)(1)(b)." (Footnote omitted.)

Appellees maintain that Officer Heavlin's actions did not amount to "willful or wanton misconduct." In support, they make the following observations: (1) Officer Heavlin maintained a distance of six to twelve car lengths between his vehicle and Wagner's motorcycle during the pursuit, (2) Officer Heavlin activated the patrol car's siren and overhead lights, (3) Officer Heavlin utilized the patrol car's loudspeaker to warn Wagner to stop, (4) Officer Heavlin was traveling only five to ten miles per hour over the posted speed limit (5) traffic was light, (6) no other motorists were confronted or injured, and (7) the roadway was dry and clear.

■ Based upon the evidence presented in this particular case, we find that genuine issues of material fact exist as to whether Officer Heavlin's actions amounted to "willful or wanton misconduct." The following factors influenced this conclusion:

First, Officer Heavlin had available to him a safe alternative to continuing the pursuit. Officer Heavlin was familiar with Wagner. He knew Wagner because he had arrested him on previous occasions. Therefore, Officer Heavlin could have discontinued the pursuit and obtained an arrest warrant, enabling him to apprehend Wagner under safer circumstances. Officer Heavlin acknowledged this alternative as a viable option and that he had considered it.

Second, there is conflicting evidence on the speeds reached by Officer Heavlin during the pursuit. Joyce Baxter testified as follows in her deposition:

"Q. Do you know anything about this accident which occurred in October 1, 1995 involving Officer Heavlin and Chris Wagner?

"A. I know what I heard on the scanner.

"Q. Why don't you tell me what you heard on the scanner.

"A. I heard when Tim was—Officer Heavlin was radioed back into Carrollton, when he was in pursuit of a motorcycle and that they went out on 332. Out—I

forget the county road number, and he said he was going about 100–some miles an hour.

"They radioed back and told him to lay—back off a little bit. And at that time, he came across and said he had just hit him, and that's when they sent somebody else, that the body was still on the road, for them to be careful.

"Q. You heard Heavlin said he was in pursuit?

"A. Uh-hum.

"Q. You said Heavlin say he was going over 100 miles an hour?

"A. Right. The sheriff's department told him to back off a little bit, that they would send somebody else out, and then he came back across and said he had just hit him, and the body was laying on the road, for them to be careful when somebody got out there, that they didn't hit him."

Third, when Wagner turned from State Route 332 onto State Route 164, Officer Heavlin continued to pursue him despite his unfamiliarity with State Route 164 and the fact that they were well beyond the city limits. (Deposition of Officer Heavlin.) The danger presented by Officer Heavlin's unfamiliarity with the road was further compounded by the nighttime conditions in which the pursuit took place.

Fourth, there is a genuine issue of material fact concerning the distance Officer Heavlin maintained between himself and the motorcycle. Callie Stevenson testified, by deposition, that Officer Heavlin was "up our tail," leaving Wagner not "much opportunity to slow down." That Officer Heavlin was unable to stop in time and that his vehicle ran over Wagner is further evidence that Officer Heavlin may not have maintained a safe enough distance behind Wagner.

Fifth, and perhaps most compelling, is Officer Heavlin's own admitted disregard for the consequences of his actions. At his deposition, Officer Heavlin testified as follows:

"Q. Were you thinking of the consequences of what could happen?

"A. At that point in time, consequences, no, I don't believe so.

"Q. You didn't evaluate the consequences when you made your election to pursue?

"A. No, sir. * * *"

Since genuine issues of material fact exist as to whether Officer Heavlin's actions amounted to "willful or wanton misconduct," we find that the trial court erred in granting summary judgment in favor of appellees.

### III Proximate Cause

■ Appellees argue that Wagner's actions, not Officer Heavlin's, were the proximate cause of Wagner's death. Appellees cite *Lewis v. Bland*, 75 Ohio App.3d 453, 456, 599 N.E.2d 814, 816, where the court held:

"When a law enforcement officer pursues a fleeing violator and the violator injures a third party as a result of the chase, the officer's pursuit is not the proximate cause of those injuries unless the circumstances indicate extreme or outrageous conduct by the officer, as the possibility that the violator will injure a third party is too remote to create liability until the officer's conduct becomes extreme."

*Lewis* and the "extreme and outrageous" test applied by it are inapplicable to the case at hand. In this case, Wagner and Stevenson were not third parties. Therefore, their presence was not "too remote to create liability until the officer's conduct becomes extreme."

### IV The Village's Direct Liability for its own Acts/Omissions

■ Appellant argues that genuine issues of material fact exist as to the village's own reckless conduct in not having a policy or training in high-speed pursuits.

Again, we apply the three-tier analysis set forth in *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610, 614–615. We begin at the first tier with the general rule that the village, as a political subdivision, is immune from tort liability for its own acts and/or omissions.

As before, at the second tier, the only exception to liability that presents itself as relevant to this case is R.C. 2744.02(B)(1). That section provides in relevant part:

"(B) Subject to sections 2744.03 and 2744.05 of the Revised Code, *a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision* or of any of its employees in connection with a governmental or proprietary function, *as follows:*

"(1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees upon the public roads when the employees are engaged within the scope of their employment and authority." (Emphasis added.)

Since we already have found that appellees are unable to establish a viable defense as a matter of law, our focus here is on the potential liability of the

village for its own acts and/or omissions in connection with the negligent operation of a motor vehicle by one of its employees (Officer Heavlin). In this case, appellant has alleged that the village of Carrollton failed to properly train Officer Heavlin in pursuit driving and that it failed to implement a pursuit policy.

On the training issue, Officer Heavlin testified in his deposition as follows:

"Q. What's your training on pursuit?

"A. I believe we had no formal training since I have been with the Carrollton Police. There is a driving section in the police academy.

"Q. What did they teach you there, Mr. Heavlin?

"A. I believe there was a driving portion, also a classroom portion, there was general areas, and they preferred that you should follow a department policy or whatever guidelines they had."

Likewise, Ronald A. Yeager, Carrollton's Chief of Police, testified in his deposition as follows:

"Q. What training had Tim Heavlin received from your department while he was a police officer with Carrollton Village since 1991 about pursuit training, Chief?

"A. Nothing, other than Hocking Technical College.

" * * *

"Q. Did anyone from the Carrollton Village Police Department, since you have been a police officer for 26 years and Chief for the last eight, ever go to a training class anywhere in Ohio or any other state about hot pursuit?

"A. Before this?

"Q. Before the collision with Chris Wagner.

"A. No, sir.

"Q. Since the collision?

"A. Yes, sir.

"Q. Who has gone since?

"A. Two classes. Sergeant Strawder, Patrolman Eick, Patrolman James, Patrolman Fairclough.

" * * *

"Q. Was the department then trained from the experiences that were learned at the training session by the officers that attended [the training]?

"A. It wasn't discussed with any of the other officers.

"Q. You didn't have a special training session to have those who were trained impart wisdom on those who hadn't attended?

"A. No, sir.

"Q. Was there any reason for that?

"A. No, sir.

"Q. Was Tim Heavlin, to your knowledge, since he has been a member of Carrollton Police, ever trained on high-speed driving?

"A. Not to my knowledge."

On the policy issue, Officer Heavlin testified as follows:

"Q. Do you need permission from anybody to follow?

"A. No, sir.

"Q. What's the policy in the village to follow?

"A. I believe we do not have a policy?"

Likewise, Chief Yeager testified that the police department did not have a pursuit policy at the time of the accident. He had requested such a policy from the village's law director as early as 1993, but was told that there were no laws or regulations requiring the village to have a policy.

Based on the foregoing evidence alone, we find that genuine issues of material fact remain as to whether the village itself was negligent in failing to properly train Officer Heavlin and/or failing to have a pursuit policy.

In addition, we take note of R.C. 2935.031, which provides:

"Any agency, instrumentality, or political subdivision of the state that employs a sheriff, deputy sheriff, constable, marshal, deputy marshal, police officer, member of a metropolitan housing authority police force, state university law enforcement officer, or Ohio veterans' home policeman with arrest authority under section 2935.03 of the Revised Code or that employs other persons with arrest authority under the Revised Code, shall adopt a policy for the pursuit in a motor vehicle of any person who violates a law of this state or an ordinance of a municipal corporation. The chief law enforcement officer or other chief official of the agency, instrumentality, or political subdivision shall formally advise each peace officer or other person with arrest authority it employs of the pursuit policy adopted by that agency, instrumentality, or political subdivision pursuant to this section.

However, R.C. 2744.02(B)(5) cautions:

"Liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty

upon a political subdivision, because of a general authorization in that section that a political subdivision may sue and be sued, or because that section uses the term 'shall' in a provision pertaining to a political subdivision."

Therefore, R.C. 2935.031 cannot be used as an independent basis of imposing liability on the village. Nevertheless, as we have already indicated, a political subdivision is potentially liable for its own acts or omissions in connection with the negligent operation of a motor vehicle by one of its employees. R.C. 2744.02(B)(1). At the very least, disregard of R.C. 2935.031, coupled with other proof, can constitute evidence of negligence on the part of a political subdivision that is subject to liability under the exception set forth in R.C. 2744.02(B)(1).

In this particular case, there was persuasive evidence that a pursuit policy could have prevented the accident. Near the end of his deposition, Officer Heavlin testified as follows:

"Q. Would you do the same thing again, if presented with the same circumstances, if you had to do it over?

"A. Yes, sir. I don't believe there would be anything differently done, unless there was more training or a policy set down.

"Q. So the discretion for you to discontinue the pursuit would be implemented the same as it was the first time? You wouldn't do anything differently?

"A. Unless there was, you know, department policies, guidelines, that, you know, changed after this event or in the future."

### V Officer Heavlin's Individual Liability

Appellant also argues that genuine issues of material fact exist with respect to his claims against Officer Heavlin individually.

R.C. 2744.03(A)(6) provides immunity to employees of a political subdivision, as follows:

"In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or section 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

" * * *

"(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

As we have already concluded, there remain genuine issues of material fact concerning the issue of whether Officer Heavlin's actions amounted to "willful or

wanton misconduct." Therefore, there remain genuine issues of material fact concerning Officer Heavlin's individual liability.

## VI Res Judicata

As alternative grounds for sustaining the trial court's grant of summary judgment, appellees argue that appellant's claims are barred by the doctrine of *res judicata* and/or collateral estoppel. The doctrine of *res judicata* consists of two related concepts: claim "preclusion (historically called estoppel by judgment in Ohio) and issue preclusion (traditionally known as collateral estoppel)." *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 381, 653 N.E.2d 226, 228. Claim preclusion holds that "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Ft. Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140, 144. Issue preclusion holds that "a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different." *Id.*

"While the merger and bar aspects of *res judicata* have the effect of precluding the relitigation of the same cause of action, the [issue preclusion] aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action." *Id.* Under the rule of issue preclusion, " 'even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit.' " *Id.*, quoting *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 112, 49 O.O.2d 435, 438, 254 N.E.2d 10, 13.

With regard to the claim preclusion aspect of *res judicata*, appellees refer to the federal court judgment rendered against appellant in *Estate of Christopher J. Wagner v. Village of Carrollton, Ohio et al.* (June 2, 1998), N.D. Ohio No. 5:97CV2479, unreported.

A claim litigated to finality in a federal district court cannot be relitigated in a state court when the state claim involves the identical cause of action previously litigated in federal court and involves the same parties or their privies. *Rogers v. Whitehall* (1986), 25 Ohio St.3d 67, 70, 25 OBR 89, 91, 494 N.E.2d 1387, 1389; *Borowski v. State Chem. Mfg. Co.* (1994), 97 Ohio App.3d 635, 640–641, 647 N.E.2d 230, 233. "The test for determining whether two cases involve the same cause of action is: (1) both cases have identical facts creating

the right of action and (2) the evidence necessary to sustain each action is identical." *Borowski,* 97 Ohio App.3d at 641, 647 N.E.2d at 233–234, citing *Norwood v. McDonald* (1943), 142 Ohio St. 299, 306, 27 O.O. 240, 243, 52 N.E.2d 67, 71. Previously, this court has narrowed the inquiry further to the legal standard applicable to each claim. *Paige v. Youngstown Bd. of Edn.* (Dec. 23, 1994), Mahoning App. No. 93 C.A. 212, unreported, 1994 WL 718839.

In this case, the facts giving rise to appellant's state and federal claims are identical. However, the evidence necessary to sustain each of appellant's claims is different. Appellant's federal claims were based upon alleged violations of Wagner's federal civil rights under Section 1983, Title 42, U.S.Code.. To resolve those claims, the federal court analyzed Officer Heavlin's conduct under a "shocks the conscience" standard as articulated by the United States Supreme Court in *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043. The court focused on whether Officer Heavlin *intended* to strike Wagner with his police cruiser. For appellant's state law claims, the inquiry is whether Officer Heavlin's actions amounted to willful or wanton misconduct. While the willful or wanton misconduct standard certainly includes intentional conduct, as is required under federal law, it also includes reckless conduct. Although the federal court found that Officer Heavlin's conduct was not intentional, it did acknowledge that a reasonable jury could find that Officer Heavlin "acted with a dogged, and perhaps *reckless,* animus." (Emphasis added.) (Order of Judge Sam H. Bell, *Estate of Wagner v. Carrollton,* N.D. Ohio No. 5:97CV2479, unreported, at 8).

With regard to the issue preclusion aspect of *res judicata,* appellees direct us to the Carroll County Court of Common Pleas' judgment in *Callie Stevenson v. Timothy D. Heavlin et al.* (May 11, 1998), Carroll C.P. No. 21641–97–256(C), unreported. In that case, Callie Stevenson filed a personal injury action against Officer Heavlin and the village of Carrollton (appellees herein). Officer Heavlin and the village brought a third-party action against the estate of Christopher Wagner (appellant herein) for indemnification/contribution. The Carroll County Court of Common Pleas granted Officer Heavlin's and the village's motion for summary judgment based on governmental tort immunity.

Although not expressly identified by appellees, the issue they presumably are seeking to preclude relitigation of, based upon the decision in the *Stevenson* case, is the trial court's finding of governmental tort immunity in that case. Although appellant was made a party to that action, it does not necessarily follow that the decision in that case will have a preclusive effect on the same issue in this case. "Collaterally estopping a party from relitigating an issue previously decided against it violates due process where it could not be foreseen that the

issue would subsequently be utilized collaterally, and where the party had little knowledge or incentive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein." *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 739, 443 N.E.2d 978, 986. It was reasonably foreseeable that the immunity issue subsequently would be used collaterally against appellant. However, consideration must be given to the procedural posture of appellant in that case. Appellees had brought appellant in as a third-party defendant for indemnification/contribution. Thus, for purposes of that action, it was in appellant's best interest that appellees were found to be immune from liability, thereby rendering appellees' indemnification/contribution claim against appellant moot. Consequently, appellant had no incentive to attack the immunity asserted by appellees. To turn around and now utilize the immunity issue against appellant would be entirely unfair and, based upon our contrary resolution of the issue, would work a manifest miscarriage of justice.

## VII Statute of Limitations

Appellees also argue that five of the six causes of action set forth in appellant's present complaint are barred by the applicable statute of limitations.

The accident giving rise to appellant's claims occurred on October 1, 1995. Initially, appellant filed a state law wrongful death action in the Carroll County Court of Common Pleas on May 6, 1996. The complaint set forth six causes of action. On March 26, 1997, appellant voluntarily dismissed the case pursuant to Civ.R. 41(A)(1), without prejudice.

On September 24, 1997, appellant filed a complaint in federal court naming the same party-defendants (appellees herein). That complaint contained federal civil rights claims as well as a state-law wrongful death claim. On June 8, 1998, the federal court granted appellees' motion for summary judgment and dismissed appellant's state-law wrongful death claim, without prejudice.

On June 12, 1998, appellant re-filed its state law wrongful death action in the Carroll County Court of Common Pleas. The complaint sets forth six "causes of action" with the identical substantive assertions made in its original state law claim filed on May 6, 1996.

R.C. 2125.02(D)(1) provides that "an action for wrongful death shall be commenced within two years after the decedent's death." R.C. 2305.19, the savings statute provides in relevant part:

"In an action commenced, or attempted to be commenced, * * * if the plaintiff fails otherwise than upon the merits, and the time limited for the commencement of such action at the date of * * * failure has expired, the plaintiff, or, if he dies

and the cause of action survives, his representatives may commence a new action within one year after such date."

"R.C. 2305.19 may be applied only to a case that was dismissed when the statute of limitations had already expired." *Lohrenzen v. Brown* (1998), 129 Ohio App.3d 770, 773, 719 N.E.2d 56, 58, citing *Thomas v. Freeman* (1997), 79 Ohio St.3d 221, 224, 680 N.E.2d 997, 1000.

■ Appellant voluntarily dismissed the May 6, 1996 complaint on March 26, 1997. The applicable statute of limitation was set to expire on October 1, 1997. Since appellant dismissed the May 6, 1996 complaint prior to the expiration of the two-year statute of limitations, R.C. 2305.19 did not apply to provide a one-year extension to re-file that action.

■ However, the inquiry does not end there. Appellant instituted a federal action, which included a state law wrongful death claim. Appellant filed the federal action on September 24, 1997, approximately one week before the statute of limitations was set to expire on the state-law wrongful death claim. The federal court dismissed the state-law wrongful death claim without prejudice on June 8, 1998. Since that claim was dismissed after the expiration of the two-year statute of limitation, R.C. 2305.19 applied to provide a one-year extension to re-file that action.

Appellees concede that appellant's present state-law wrongful death action was timely filed. They argue, however, that the present action expands on the one that was filed with and made a part of the federal action. Specifically, appellees argue that five of the six causes of action set forth in appellant's present complaint did not appear in the federal complaint.

After comparing and contrasting the present complaint with the federal complaint, we find that appellant has made no attempt to expand upon his state-law wrongful death claim. The present complaint, while more expansive in form, is not so in substance. The present complaint sets forth a state-law wrongful claim. The causes of action simply set forth the grounds upon which that claim is based.

Accordingly, we find appellant's sole assignment to be with merit.

The judgment of the trial court is hereby reversed, and this cause is hereby remanded to the trial court for further proceedings according to law and consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

Cox and Vukovich, JJ., concur.