JOURNAL ENTRY AND OPINION
{¶ 1} Yevgen Pylypiv, father and administrator of the estate of Andrey Pylypiv, and Ludmilla Gregorashenko, wife and administratrix of the estate of Victor Gregorashenko, appeal from an order of the trial court granting summary judgment in favor of the City of Parma on claims including wrongful death and negligence. They claim the court erred in granting summary judgment as the City is not immune from suit, and that its officers were the proximate cause of the accident. We affirm.
 {¶ 2} The record reveals that at approximately 11:30 p.m. on the evening of June 30, 2002, twenty-seven-year-old Victor Gregorashenko was driving his motorcycle with sixteen-year-old Yevgen Pylypiv as his passenger. The pair were driving with a group of other motorcyclists when they passed Parma police officers Richard Burger and James Brink. One motorcycle in the group "popped a wheelie" as it passed the police car, and, believing Gregorashenko's motorcycle committed the act, the officers activated their overhead lights for a traffic stop.
 {¶ 3} As the police cruiser approached, Officer Brink ordered Gregorashenko to pull over. Gregorashenko pulled into the curb lane in an apparent stop, but then turned and fled down Wales Avenue — a dead-end street. The officers immediately activated their lights and sirens and called the police dispatcher to report that they were in pursuit of a motorcycle and gave the dispatcher the license plate number. The officers then turned onto Wales Avenue to follow the car.
 {¶ 4} Wales Avenue is a residential street with a 25 m.p.h. speed limit and is lined with homes approximately every fifty feet. There are also three main intersections with stop signs on Wales for eastbound traffic between State Road and the end of the street.
 {¶ 5} Near West 33rd Street, the officers lost sight of the motorcycle. They proceeded down the suspected path of the motorcycle with lights and sirens activated and traveling approximately 35 to 40 m.p.h. The officers slowed through the stop signs at each of the three intersections until they reached the dead-end of the street.
 {¶ 6} At the dead-end, there are three guardrails that line the pavement overlooking a large ravine. There is a yellow and black reflective sign on one of the end guardrails and also a working street light directly over the area surrounding the guardrails. When the officers saw no sign of the motorcycle in this area, they exited the car and searched the surrounding wooded area, where they ultimately found the bodies of Gregorashenko and Pylypiv.
 {¶ 7} Gregorashenko's motorcycle apparently struck the guardrail, and the impact threw the motorcycle and its passengers over the rail and into the heavily wooded area. The men were rushed to the hospital, where Pylypiv was declared dead on arrival. Gregorashenko was life-flighted to MetroHealth Medical Center in Cleveland. He died from his injuries four days later.
 {¶ 8} An investigation of the accident, which included eyewitness statements and the report of an accident reconstructionist, revealed that the motorcycle had been traveling at a minimum speed of 66 m.p.h. and had failed to stop at any of the three posted stop signs before it collided with the guardrail.
 {¶ 9} In June 2004, Yevgen Pylypiv, father and administrator of the estate of Andrey Pylypiv, and Ludmilla Gregorashenko, wife and administratrix of the estate of Victor Gregorashenko, (collectively referred to as "the Estates") sued the City of Parma (hereafter, "the City") and individually sued Parma police officers Brink and Burger.
 {¶ 10} In December 2004, the City and the individual officers moved for summary judgment, which the court granted. Pylypiv and Gregorashenko appeal from this order in the assignments of error set forth in the appendix to this opinion.
I. IMMUNITY
 {¶ 11} In their first assignment of error, the Estates contend that the pursuit by the police officers falls under an exception to immunity under R.C. 2744.02(B)(1) because the officers negligently operated their police cruiser. They further assert that officers Burger and Brink were the proximate cause of the deaths, and that their negligence overrides any immunity due to their dangerous pursuit. The Estates contend that such evidence presents material questions of fact which preclude the grant of summary judgment.
 {¶ 12} Although the Estates' arguments of immunity are combined as to both the City itself and the individual officers, we will address each claim separately.
A. CITY IMMUNITY
 {¶ 13} R.C. 2744.02(A)(1) provides that a political subdivision is generally immune from tort liability for injury, death, or loss to persons or property incurred in connection with the performance of a governmental or proprietary function of the political subdivision. R.C.2744.02(B), however, lists several exceptions to this general grant of immunity.
 {¶ 14} Determining whether a political subdivision is immune from liability entails a three-tier analysis. Cater v. Cleveland,83 Ohio St.3d 24, 28, 1998-Ohio-421. The first tier states the general rule that political subdivisions are immune from tort liability. Id. Specifically, R.C. 2744.02 (A)(1) provides in relevant part:
"Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."
 {¶ 15} The City of Parma is a "political subdivision" as defined by R.C. 2744.01(F). We therefore proceed to the second tier of analysis which states that, under this tier, immunity can be removed for any one of the five exceptions to immunity as outlined under R.C. 2744.02 (B):
"(1) * * * political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability:(a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct; * * * (2) * * * political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.(3) * * * political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge.(4) * * * political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, * * *.(5) * * * a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed * * * by a section of the Revised Code, * * *."
 {¶ 16} At the third tier, immunity can be reinstated if the political subdivision can successfully argue an available defense. The exceptions set forth in R.C. 2744.02(B), by its express terms, are subject to the defenses listed in R.C. 2744.03. See Wagner v. Heavlin (2000),136 Ohio App.3d 719, 726.
 {¶ 17} The Estates appear to assert that the first exception to immunity applies, and make no argument with reference to any of the remaining exceptions. Under R.C. 2744.02(B)(1), a political subdivision may be held liable for injuries caused by the negligent operation of a motor vehicle by an employee when the employee is engaged in the scope of his or her employment. Nevertheless, the political subdivision is immune
from the liability imposed by R.C. 2744.02(B)(1) if the alleged negligence occurred when one of its police officers was "operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct." R.C.2744.02(B)(1)(a).
 {¶ 18} While the Estates concede that R.C. 2744.02(B)(1)(a) provides an exception for members of police agencies responding to "emergency calls," they contend that officers Burger and Brinks were not making such an emergency call.
 {¶ 19} An emergency call is defined in R.C. 2744.01(A) as: "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer."
 {¶ 20} The Estates misplace emphasis on the emergency call — the emergency call did not occur when Gregorashenko "popped a wheelie," but rather when he refused to pull over after the officer's request and fled the scene. The officers then observed the motorcycle evade capture by turning down a dead-end street at a high rate of speed. Wales Avenue is a residential neighborhood with a posted speed limit of 25 m.p.h., and has homes lining the street. From later observations and expert reports, the motorcycle was traveling down this residential street at approximately three times the posted speed limit, and was, in fact, going so fast that the officers lost track of the motorcycle. It is clear from the facts that Gregorashenko was creating an inherently dangerous situation, and that the officers' notification to dispatch of the situation and their continued trail of the motorcycle constituted an emergency call which then demanded an immediate response.
 {¶ 21} The second provision of the defense of "emergency call" is that "the operation of the vehicle did not constitute willful or wanton misconduct." We find that it did not.
 {¶ 22} As held by the Ohio Supreme Court, an individual is "reckless" if he commits "an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Thompson v. O'Neil (1990), 53 Ohio St.3d 102, 104-105. Further, and as held in Moffitt v. Litteral (Sept. 20, 2002), Montgomery App. No. 19154, 2002-Ohio-4973, for the purposes of R.C. 2744.03, "malice" refers to "the willful and intentional desire to harm another, usually seriously, through conduct which is unlawful or unjustified."
 {¶ 23} Eyewitness affidavits estimate Gregorashenko's speed from 80 to 100 m.p.h. through the neighborhood, and aver that he failed to stop at any of the posted stop signs. These affidavits further state that the police cruiser was so far behind the motorcycle that it arrived a full 15 to 20 seconds after the crash. The officers speed of 35 to 40 m.p.h. in following the motorcycle and slowing through all intersections additionally shows that the officers' conduct was not such that it risked any physical harm to another.
 {¶ 24} We find that this portion of the Estates' first assignment of error lacks merit.
B. THE OFFICERS' INDIVIDUAL IMMUNITY
 {¶ 25} Under R.C. 2744.01(B), a police officer is classified as an "employee" of a subdivision. Any immunity provided to these individual police officers is granted through R.C. 2744.03, which provides:
"(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee."
 {¶ 26} In Sutterlin v. Barnard, (Oct. 6, 1992), Montgomery App. No. 13201, police officers attempted to stop a car that had been exceeding the speed limit and crossing the center traffic line. After the officers activated the lights and sirens, the car continued to evade capture, reaching a speed of approximately 85 m.p.h. The chase continued for one mile when the driver lost control and struck the plaintiff's vehicle, causing injury to the plaintiff and her son. The court granted summary judgment in favor of the township and of the chasing officer finding:
"The chase in this case took approximately one minute and even [the plaintiff's expert] concedes that [the officer's] misconduct in pursuing [the driver] after [the officer] realized [the driver] was not going to stop which was six-tenths of a mile from the beginning of the pursuit. In short, [the officer] had less than thirty seconds to decide whether to discontinue the pursuit of the speeding motorist.
Construing the evidence most favorably to the plaintiff, reasonable minds could not conclude that [the officer] had acted without any regard for the safety of the public or that his conduct was extreme or outrageous."
 {¶ 27} The record in the instant case reveals that as the officers attempted to pull over Gregorashenko's motorcycle for a traffic stop, it took off at a high rate of speed, turning down a dead-end, residential street to evade the police. Although Wales Avenue had a posted speed limit of 25 m.p.h., the testimony of both the officers and the eyewitnesses supports the conclusion that while the motorcycle was driving at a minimum speed of 66 m.p.h. down a residential street, the police car never exceeded 40 m.p.h., slowed down through each of the stop signs, and even lost sight of the motorcycle due to its excessive speed. Based on this evidence, it cannot be argued that a "high-speed chase" took place or that the officers pursued the motorcycle in a wanton, reckless manner or in bad faith.
 {¶ 28} The Estates additionally contend that the officers' conduct was willful and wanton and exceeded the negligence requirement necessary to negate immunity. They claim that the officers had a duty under R.C. 4511.21
to "drive with due regard for the safety of all persons using the street or highway." Having fully addressed the officers' alleged willful and wanton conduct while analyzing allegations of the city's lack of immunity, we incorporate that portion of our decision herein, and find that this contention lacks merit.
 {¶ 29} For these reasons, this portion of the Estates' first assignment of error asserting liability on behalf of the individual officers lacks merit.
C. PROXIMATE CAUSE
 {¶ 30} The Estates additionally assert that officers Burger and Brink were the proximate cause of both Gregorashenko's and Pylypiv's deaths. Under this theory, they argue that the officers' conduct under such dangerous conditions was negligent and that material questions of fact remain as to whether the officers were engaged in a "pursuit."
 {¶ 31} In Clinger v. Duncan (1957), 166 Ohio St. 216, 223, the Supreme Court defined proximate cause as follows:
"The term `proximate cause,' is often difficult of exact definition as applied to the facts of a particular case. However, it is generally true that, where an original act is wrongful or negligent and in natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established, and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability."
 {¶ 32} In Vince v. City of Canton (April 13, 1998), Stark App. No. 1997CA00299, the court similarly affirmed the trial court's grant of summary judgment in favor of the city where a motorcyclist died while fleeing police. Like the case at hand, Vince was first observed by officers while "popping a wheelie." Vince likewise ignored the officer's direction to stop and sped away. When Vince was observed later in the evening for a second time, the officer again attempted to stop him, and Vince again fled. On a third occasion, the officer again spotted Vince and attempted to pull him over. Vince again fled from the officer; however, he lost control of his motorcycle and crashed to his death.
 {¶ 33} On the issue of proximate cause, the Vince court held,
"[A]ppellants' claims cannot survive summary judgment on the issue of proximate cause. Under no reasonable interpretation of the facts can the police officer be found to have been the proximate cause of the accident that took the decedent's life. In considering all the testimony, from the affidavits, in the light most favorable to appellants, at best, this testimony establishes that the police officer pursued the decedent, at a high rate of speed, and the decedent fled the scene and refused to stop even though he knew the police officer was in pursuit of him.
At the time of the accident, the police officer was thirty seconds behind the decedent, which translates into a significant distance behind the decedent. At only twenty-five miles per hour, the police officer was at least 1,100 feet behind the decedent and if traveling at fifty miles per hour, the police officer was in excess of 2,200 feet behind the decedent. These facts clearly establish that the police officer, although in pursuit of the decedent, was at such a distance that he did not proximately cause the decedent to crash his motorcycle."
 {¶ 34} In addition to the facts previously cited, it is clear that the officers in no way cut off or physically forced Gregorashenko or Pylypiv down Wales Avenue. Instead, after the motorcycle fled, the officers were no closer than 1,000 feet from the motorcycle. According to the affidavits of the officers and eyewitnesses, the police cruiser was not even in sight at the time of the crash.
 {¶ 35} It cannot be found that the officers' conduct was the proximate cause of the motorcycle not being able to stop before the guardrails. To the contrary, the city's expert report found that if Gregorashenko had been driving at the speed limit, he could have stopped. (Affidavit of Henry Lipian, at 2). Moreover, the accident reconstruction report submitted by Introtech found that due to the speed of the motorcycle, Gregorshenko could not have stopped for a stop sign, let alone prior to reaching the guardrail.
 {¶ 36} This portion of the Estates' first assignment of error also lacks merit.
 {¶ 37} Based on our rationale on each of the Estates' assertions of liability, we reject the Estates' first assignment of error in its entirety.
II. SIGNAGE
 {¶ 38} In their second assignment of error, the Estates contend that the trial court erred in granting summary judgment to the City regarding its negligent maintenance of signage because the City was not immune from suit.
 {¶ 39} They argue that the City constructed, designed and placed barriers and signage in such a way that no reasonable driver could have known that the street had no outlet. They additionally argue that the City knowingly, recklessly, wantonly and negligently failed to repair the deficiencies in the barriers and signage.
 {¶ 40} As this Court previously addressed the five exceptions to immunity, we proceed directly to the contested exception and find that the Estates contend that R.C. 2744.02(B)(3) applies to bar immunity. This provision states:
"(3) * * * political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge."
 {¶ 41} The Estates also contend that R.C. 2744.02(B)(5) applies, which states:
"(5) * * * a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed * * * by a section of the Revised Code, * * *."
R.C. 2744.03(A)(5) provides that:
"(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."
 {¶ 42} At the same location of the guardrails, the City erected a yellow and black striped sign to indicate the dead-end. "There is also an overhead light at end of the road shining down on the guardrail area." (Introtech report, at 4).
 {¶ 43} According to the report submitted by Introtech, the yellow and black rectangular signs in place at the time of the accident comply with Section 3C.01 of The Ohio Manual of Uniform Traffic Control Devices.
(Introtech report at 4). The Introtech report noted that Section 3C.04 requires the use of a diamond shaped sign with retro reflective buttons to mark the end of the roadway, and concluded that the stop sign located on Wales at South Park was retro reflective and met the standards set forth in the manual, a sign easily discernible for a driver going 25 m.p.h. while cresting the hill on Wales. (Introtech report at 5).
 {¶ 44} For these reasons, we find that the City complied with The OhioManual of Uniform Traffic Control and that the warning signs were adequately posted and adequately lit, and that the posting of such signs is not indicative of malicious purpose, bad faith or a wanton or reckless manor.
 {¶ 45} The Estates' second assignment of error lacks merit.
 {¶ 46} The judgment of the trial court is affirmed.
It is ordered that appellee shall recover of appellant costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Gallagher, P.J., And McMonagle, J. concur
 APPENDIX A ASSIGNMENTS OF ERROR:
 "I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THEDEFENDANT OFFICERS AND THE CITY OF PARMA WHERE THEY WERE NOT IMMUNE FROMSUIT AND WERE THE PROXIMATE CAUSE OF DECEDENTS' DEATHS.
 A. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS OFFICERSBURGER AND BRINK ARE NOT IMMUNE FROM SUIT UNDER SECTION 2744.02.
 B. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS OFFICERSBURGER AND BRINK WERE THE PROXIMATE CAUSE OF THE DECEDENT'S [SIC]DEATHS.
 II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF THECITY OF PARMA REGARDING ITS NEGLIGENT MAINTENANCE OF SIGNAGE WHERE THECITY WAS NOT IMMUNE FROM SUIT."