JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellants Officer Theodore Shaffer and the City of Cleveland Heights (collectively "the city") appeal the trial court's decision denying its joint motion for summary judgment thereby failing to find that as a political subdivision they are immune from liability under R.C. 2744.02(C).[1] ("The city") assigns the following errors for our review:
 "I. The trial court erred in denying Appellant Theodore Shaffer and Appellant City of Cleveland Heights' joint motion for summary judgment by failing to find that appellants are immune from liability pursuant to R.C. Chapter 2744 for the claims asserted by Appellee Pamela Hubbard because Appellant Theodore Shaffer was responding to an emergency call and did not act wantonly, willfully, or recklessly."
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} On August 22, 2004, Cleveland Heights Police Officer Theodore Shaffer ("Officer Shaffer"), collided with a car in which Appellee Pamela Hubbard ("Hubbard") was a passenger. The collision occurred at the intersection of Elbon and Noble Roads, in the city, at approximately 12:41 a.m.
 {¶ 4} As a result of the collision, Hubbard filed a personal injury suit against Shaffer and the city. In the suit, Hubbard alleged that Officer Shaffer operated the *Page 4 
police cruiser negligently, recklessly, and with willful and wanton disregard for the safety of others. Hubbard also alleged that Officer Shaffer was not responding to an emergency call and did not have his emergency lights or siren activated. Hubbard further alleged that as a result of Officer Shaffer's negligence, she sustained permanent bodily injuries.
 {¶ 5} On August 30, 2006, the city responded to Hubbard's suit and averred that they were entitled to an absolute and qualified immunity pursuant to R.C. 2744.
 Car Accident {¶ 6} Officer Shaffer testified at his deposition that shortly after midnight on August 22, 2004, he was on general duty patrol when he received a radio transmission from Officer Chris Giordano. Officer Shaffer testified that Officer Giordano asked if a warrant had been issued for Brew Story, an individual who had fled from Officer Shaffer a week earlier. Officer Shaffer indicated that he had requested the warrant, but did not know if it had yet been issued. Officer Giordano later confirmed with dispatch that a warrant had been issued for Brew Story.
 {¶ 7} Officer Shaffer testified that he asked Officer Giordano for his location, and Officer Giordano indicated that he was on Elbon Road, and also indicated that Brew Story was in his mother's car. Officer Shaffer testified that he told Officer Giordano that he would come to the location within a few minutes. Officer Shaffer *Page 5 
testified that when he told Officer Giordano that he was en route, he did not know whether Officer Giordano had Brew Story in custody.
 {¶ 8} Officer Shaffer testified that following the conversation with Officer Giordano, he stopped in the vicinity of Mayfield Road, opposite the Cleveland Heights City Hall, to talk with police officers from the city of Fairview Park. Officer Shaffer testified that the Fairview Park police officers were en route to the Cleveland Heights jail to pick up an inmate and needed direction to the jail's sally port. Officer Shaffer testified that after giving the Fairview Park police officers the directions, he radioed dispatch to open the sally port for the officers.
 {¶ 9} Officer Shaffer testified that following his conversation with the Fairview Park police officers, he proceeded eastbound on Mayfield Road towards Noble Road without activating the emergency lights or siren. Officer Shaffer testified that he activated the cruiser's emergency lights as he was traveling southbound on Noble Road in the vicinity of Rosemond and Navahoe Roads. Officer Shaffer testified that moments after activating the cruiser's emergency lights, but before he could activate the siren, he collided with a vehicle that was attempting to make a left turn before yielding to oncoming traffic.
 {¶ 10} Officer Shaffer further testified that prior to the accident, he had been traveling at approximately 45 mph, but had slowed down to 40 mph, in response to a flashing yellow light at Noble and Elbon Roads. Officer Shaffer testified that he did *Page 6 
not recall Officer Giordano asking him to come to the location, nor was he specifically dispatched to the location.
 {¶ 11} Steven Maclin, a college professor who lived in an apartment at the intersection of Elbon and Noble Roads, testified at his deposition that he heard the cars collide. Maclin testified that he and his wife had just retired to their bedroom when the accident occurred. They immediately got out of bed and looked through the window, which had a direct view to the intersection. Maclin testified that the cruiser's emergency lights were not activated. Maclin also testified that prior to hearing the collision, he did not hear any sirens. Maclin testified that he made the 911 emergency call to report the accident and then went outside see if he could be of assistance.
 {¶ 12} Hubbard testified at her deposition that on August 22, 2004, she was on her way home from visiting a friend when the accident occurred. Hubbard testified that she was seated in the front passenger seat, and as she was almost at her apartment, she turned to say goodnight to the passenger seated directly behind the driver. Hubbard testified it was at that moment that the police cruiser driven by Officer Shaffer struck the front passenger side of the vehicle. Hubbard testified that the police cruiser's emergency lights were not activated.
 {¶ 13} A motorist, Dedrick Booth, who witnessed the accident, provided the following statement to the police: *Page 7 
 "I pulled out of the BP gas station, (the Warrensville exit) northbound Noble Road. I were [sic] in the left middle lane and so were the officer that were in the accident. The officer was behind me about thirty feet away. By the time we passed the street "Summit Park" the officer cut to the right lane and sped pass me [sic] with no lights or sirens. There was a car heading the opposite way (southbound Noble) and made a left turn on Elmwood. The officers crashed into the front passenger side and the car flew into the pole and all traffic lights were swinging and there was a lot of smoke."[2]
 {¶ 14} On March 28, 2007, the city filed a motion for summary judgment asserting that they were immune from liability for Hubbard's injuries, because Officer Shaffer was responding to an emergency call and did not operate the police cruiser in a wanton, willful, or reckless manner. Hubbard opposed the motion. On May 7, 2007, the trial court denied the motion for summary judgment.
 Summary Judgment {¶ 15} In the sole assigned error, the city argues the trial court erred in not granting summary judgment in its favor on all claims against them on the basis of the sovereign immunity provided to the city as a political subdivision by Chapter 2744 of the Ohio Revised Code. We disagree. *Page 8 
 {¶ 16} We review an appeal from summary judgment under a de novo standard of review.[3] Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.[4] Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion, which is adverse to the non-moving party.[5]
 {¶ 17} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment.[6] If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact.[7]
 {¶ 18} The crux of the city's motion for summary judgment was that it is entitled to governmental tort immunity. *Page 9 
 {¶ 19} R.C. Chapter 2744 establishes a three-tiered analysis for determining whether a political subdivision is immune from tort liability.[8] First, R.C. 2744.02(A) establishes the general rule that a political subdivision is immune from liability for acts or omissions connected with governmental or proprietary functions. Second, this general immunity is revoked if the exception in R.C. 2744.02(B)(1) applies, subject to the defenses of 2744.02(B)(1)(a-c). Third, if a political subdivision is exposed to liability by virtue of the provisions of R.C. 2744.02, R.C. 2744.03(A) provides defenses to certain specific conduct that the political subdivision may assert, again subject to the limitations of R.C. 2744.03(B).[9]
 {¶ 20} Regarding the first tier of the analysis, it is not disputed that Officer Shaffer and the city are included in the term "political subdivision."[10] In addition, as an on-duty police officer, Officer Shaffer was engaged in a "governmental function" at the time of the accident.[11] Thus, the general rule of immunity, R.C. 2744.02(A), applies. *Page 10 
 {¶ 21} The second tier of the analysis requires a court to determine whether any of the exceptions to immunity apply. Under this tier, immunity can be removed for any one of the five exceptions to immunity outlined under R.C. 2744.02(B):
 "(1) * * * [Political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full defenses to that liability: (a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct; * * *
 (2) * * * [Political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions. (3) * * * political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads, except that it is a full defense to that liability, when a bridge within a municipal corporation is involved, that the municipal corporation does not have the responsibility for maintaining or inspecting the bridge. (4) * * * [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, * * *. (5) * * * [A] political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed * * * by a section of the Revised Code, * * *."
 {¶ 22} At the third tier, immunity can be reinstated if the political subdivision can successfully argue an available defense. The exceptions set forth in R.C. *Page 11 2744.02(B), by its express terms, are subject to the defenses listed in R.C. 2744.03.[12]
 {¶ 23} The city contends it is immune from the liability imposed by R.C. 2744.02(B)(1) for the alleged negligence because Officer Shaffer was operating the police cruiser while responding to an emergency call and his operation of the vehicle did not constitute willful or wanton misconduct. We are not persuaded.
 Emergency Call {¶ 24} An emergency call is defined in R.C. 2744.01(A) as:
 "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer."[13]
 {¶ 25} Generally, the question of whether a particular situation constitutes an "emergency call" is a question of fact.[14]
 {¶ 26} In the present case, despite the city's contention to the contrary, there is a question of fact whether Officer Shaffer was responding to an emergency call. *Page 12 
Officer Shaffer testified when Officer Giordano inquired whether a warrant had been issued for Brew Story, he did not request him to come to the location and he was not dispatched to the location. Thus, Officer Shaffer made a unilateral decision to go to Officer Giordano's location.
 {¶ 27} The record also indicates that when Officer Shaffer decided to go to Officer Giordano's location, he was not fully aware of what was taking place. Officer Shaffer testified in pertinent part as follows:
 "Q. Do you know whether Officer Giordano already had Brew Story in custody?
 A. No, because he had him stopped, I know that.
 Q. Do you know whether he actually had him in the police cruiser-
 A. No.
 Q. Or whether he was in his own car?
 A. No, I didn't know.
 Q. So, for all you knew, Brew Story could have been in the back of Officer Giordano's vehicle, correct, and in custody?
 "A. Possibly. "[15] *Page 13 
 {¶ 28} The above excerpt indicates that Officer Shaffer proceeded to Officer Giordano's location without knowing whether Brew Story was in custody or whether he was stopped and sitting in his mother's car.
 {¶ 29} In addition, the record indicates that after Officer Shaffer decided to go to Officer Giordano's location, he stopped to converse with officers from the Fairview Park Police Department, give them directions to the jail, and call dispatch to instruct them to open the sally port for the officers. The record is unclear about how long Officer Shaffer's conversation with the Fairview Park police officers lasted. However, given that Officer Shaffer had time to stop with the Fairview Park police officers, before proceeding to the location, the average person could question whether this was a situation requiring an immediate response.
 {¶ 30} Based on the evidence presented, we find that genuine issues of material fact exist as to whether Officer Shaffer was on an emergency call.
 Wanton, Willful, and Reckless Misconduct {¶ 31} Wanton misconduct is the failure to exercise any care toward one to whom a duty of care is owed under circumstances in which there is a great probability that harm will result and the tortfeasor knows of that probability.[16] In the *Page 14 
continuum between negligence and intentional misconduct, wanton misconduct is a degree greater than negligence.[17]
 {¶ 32} An individual acts "recklessly" when he "does an act or intentionally fails to do an act which is in his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."[18]
 {¶ 33} "Willful misconduct" is defined as:
 "* * * `Something more than negligence and it involves a more positive mental state prompting the injurious act than does wanton misconduct.' * * * The intention underlying such misconduct relates to the misconduct, not the result. Thus, `willful' misconduct is an Intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury."* * *"[19]
 {¶ 34} Based on the review of the record, we find that genuine issues of material fact exist as to whether Officer Shaffer's actions amounted to wanton, willful, or reckless misconduct. The following factors influenced this conclusion. *Page 15 
 {¶ 35} Two independent eyewitnesses indicated that Officer Shaffer's emergency lights were not activated prior to the collision. Dedrick Booth indicated that Officer Shaffer was behind him as he traveled northbound on Noble. Booth indicated that Officer Shaffer moved to the right lane and sped passed him without his emergency lights or siren activated.
 {¶ 36} In addition, Steven Maclin, whose apartment overlooked the intersection, testified that he heard the collision and immediately looked through his bedroom window. Maclin testified that the police cruiser's emergency lights were not activated.
 {¶ 37} Further, Hubbard testified in pertinent part as follows:
 "Q. Sitting here now, you do not know whether there were or were not emergency lights on the police cruiser just before it impacted it; am I correct?
 Mr. Spellacy: Objection.
 Q. Yes?
 A. No, there was no lights. [sic]
 Q. How do you know that?
 A. I know that.
 Q. How do you know that?
 A. The car was on top of me. I would have see lights. [sic] I would have seen lights."[20] *Page 16 
 {¶ 38} Since genuine issues of material fact exist as to whether Officer Shaffer was responding to an emergency call and whether his actions amounted to wanton, willful, or reckless misconduct, we find that the trial court did not err in denying the city's motion for summary judgment. Accordingly, we overrule its sole assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, P.J., and MARY J. BOYLE, J., CONCUR
[1] The denial of a motion for summary judgment is ordinarily not a final appealable order. However, pursuant to the recent pronouncement of the Ohio Supreme Court in Hubbell v. City of Xenia, 115 Ohio St.3d 77,2007-Ohio-4839, an order that denies a political subdivision immunity under R.C. Chapter 2744 is a final appealable order, appellants' appeal is properly before this court.
[2] Plaintiff's Exhibit 3, Cleveland Heights Police Department, Miscellaneous Report Form.
[3] Baiko v. Mays (2000), 140 Ohio App.3d 1, citing Smiddy v. TheWedding Party, Inc. (1987), 30 Ohio St.3d 35; Northeast Ohio Apt. Assn.v. Cuyahoga Cty. Bd. of Commrs. (1997), 121 Ohio App.3d 188.
[4] Id. at 192, citing Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704.
[5] Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
[6] Dresher v. Burt, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.
[7] Id. at 293.
[8] Grooms v. Crawford, 12th Dist. Nos. CA2005-05-008, CA2005-05-059, 2005-Ohio-7028, P11.
[9] Burnell v. Dulle, 169 Ohio App.3d 792, 2006-Ohio-7044.
[10] See R.C. 2744.01(F).
[11] See R.C. 2744.01(C)(2)(a).
[12] See Wagner v. Heavlin (2000), 136 Ohio App.3d 719, 726.
[13] Pylypiv v. City of Parma, Cuyahoga App. No. 85995,2005-Ohio-6364
[14] Golden v. Department of Highway Safety (June 11, 1996), 10th Dist. No. 95API12-1616 citing Horton v. Dayton
(1988), 53 Ohio App.3d 68, 73-74.
[15] Shaffer's Depo. at 40.
[16] Hunter v. Columbus (2000), 139 Ohio App.3d 962, 969, citingMatkovich v. Penn Cent. Transp. Co. (1982), 69 Ohio St.2d 210.
[17] Brockman v. Bell (1992), 78 Ohio App.3d 508, 515.
[18] Lipscomb v. Lewis (1993), 85 Ohio App.3d 97, 102.
[19] Gardner v. Ohio Valley Region, 10th Dist. No. 01AP-1280, 2002-Ohio-3556, quoting Hunter supra at 969-970.
[20] Hubbard's Depo. at 32. *Page 1