WAITE, J.
*495 {¶1} Appellants John, Jane, and Joy Doe (collectively referred to as "Appellants") appeal a January 19, 2018 Belmont County Common Pleas Court decision which granted summary judgment in favor of Appellees Walter E. Skaggs, Kelly Rine, and St. Clairsville Schools (collectively referred to as "Appellees".) Appellants argue that the trial court erroneously ruled Appellees were entitled to immunity. Appellants contend that Appellees were stripped of immunity pursuant to R.C. 2744.02(B)(2), (5) and R.C. 2744.03(A)(1)(b), (c) and cannot reestablish immunity. For the reasons provided, Appellants' arguments are without merit and the judgment of the trial court is affirmed. However, the matter is remanded for purposes of addressing the personal liability of R.D., a nonparty to this appeal.
Factual and Procedural History
{¶2} Joy Doe was a student and softball player at St. Clairsville High School. During the relevant time period, R.D. was the St. Clairsville High School softball coach. Also relevant to this appeal, Skaggs was the superintendent and Rine was the athletic director of St. Clairsville High School.
{¶3} R.D. had been the high school softball coach for ten years. According to testimony from Skaggs, R.D.'s coaching certificate expired either just before the softball season or midway through the season. According to Skaggs, the paperwork, documentation, coaching class, and background check had been completed. However, the certification process had not been completed due to a payment or paperwork issue.
{¶4} While in sixth grade, Doe took private pitching lessons from R.D. (6/16/17 Doe Depo., 30.) When Doe entered high school, she developed a closer relationship with R.D. During Doe's sophomore year, R.D. grabbed Doe around the waist and kissed her. At some point thereafter, the two began to have sexual relations.
{¶5} According to Doe, all sexual activity took place at R.D.'s house. (6/16/17 Doe Depo., p. 77.) According to Doe, she visited R.D.'s house multiple times a week. At one point, Doe's father expressed concern about the number of visits and she told him that R.D. was helping her contact college coaches about a potential softball scholarship. According to Doe, she also spent a significant amount of time in R.D.'s classroom, which was located in the middle school building. Doe testified that there were no outward advances by either R.D. or herself in front of anyone or outside of R.D.'s house. (6/16/17 Doe Depo., p. 69.)
{¶6} During the relevant time frame, R.D. and Doe exchanged over 10,000 text messages. At some point, R.D. texted Doe that she would kill herself if anyone found out about their relationship. Doe and Mrs. Doe testified that R.D. gave Doe several gifts during the relevant time period. These gifts ranged from small gifts to more expensive ones that raised concerns by Mrs. Doe.
{¶7} The sexual encounters continued until May of 2016, Doe's senior year. At that time, a photograph of R.D. and Doe on a bus was shown to the superintendent at another local school. It is unclear who took the photograph and who gave it to the superintendent. The photograph, which is not in the record, apparently depicts R.D.
*496 and Doe sitting on the bus with one of their knees near the other's crotch. The superintendent notified Skaggs who called Mrs. Doe to the school for a meeting. Mrs. Doe, Skaggs, and Michael McKeever (the middle school principal) were present at the meeting. Mrs. Doe left the meeting and discussed the allegations with Doe who confirmed them. Mrs. Doe called Skaggs and notified him. Skaggs immediately went to the softball field where R.D. was preparing for a game and fired her. R.D. was charged criminally and eventually pleaded guilty to several counts of gross sexual conduct. She was sentenced to eighteen months of incarceration.
{¶8} On February 22, 2017, Appellants filed a complaint against St. Clairsville Schools ("St. Clairsville") and against Skaggs and Rine as individuals. R.D. was also personally named as a defendant, however, apparently there were issues with service and she did not answer the complaint. As such, she is not involved in this appeal. The original complaint included the following claims: "Negligence of [R.D.], St. Clairsville Schools, and individual defendants and claim of sexual assault and battery," "Negligent Retention/Negligent Supervision by the individual defendants," and "Tort of Outrage/Negligent Infliction of Emotional Distress." (2/22/17 Complaint.) In their answer, Appellants claimed sovereign immunity pursuant to R.C. 2744.
{¶9} On November 17, 2017, Appellees filed a motion for summary judgment. On December 4, 2017, Appellants filed a competing motion for summary judgment. On January 4, 2018, Appellants filed an amended complaint with the trial court's permission. The amended complaint asserted the following claim: "Reckless, Willful, Wanton and Intentional Conduct of [R.D.], St. Clairsville Schools, and individual defendants and claim of sexual assault and battery." (1/4/18 Amended Complaint, Count I.) On January 18, 2018, the trial court granted summary judgment in favor of Appellees. It is from this entry that Appellants appeal.
Summary Judgment
{¶10} An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). Grafton v. Ohio Edison Co. , 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. Temple v. Wean United, Inc. , 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. Hoyt, Inc. v. Gordon & Assoc., Inc. , 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).
{¶11} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) Dresher v. Burt , 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. Id. at 293, 662 N.E.2d 264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving *497 party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. Brewer v. Cleveland Bd. of Edn. , 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).
{¶12} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. Temple , 50 Ohio St.2d at 327, 364 N.E.2d 267.
Miscellaneous Issues
{¶13} We note that Appellants amended their complaint to include the language "reckless, willful wanton and intentional conduct" after the competing motions for summary judgment were filed. The trial court accepted the amended complaint and ruled on the new claim. While Appellees objected to the trial court and refer to their objection on appeal, they do not raise the issue of Appellants' amendment as an assignment of error. "The Civil Rules do not provide that a pending motion for summary judgment is rendered void by the filing of an amended complaint." Conway v. Thermafab Alloy, Inc. , 8th Dist. No. 98091, 2013-Ohio-1539, 2013 WL 1694915, ¶ 34, citing Singer v. Fairborn , 73 Ohio App.3d 809, 813, 598 N.E.2d 806 (2d Dist.1991) ; R & R Plastics, Inc. v. F.E. Myers Co. , 92 Ohio App.3d 789, 808, 637 N.E.2d 332 (6th Dist.1993). There is no need for the moving party to renew its motion for summary judgment. Id.
{¶14} On appeal, the parties also dispute whether Appellants' complaint included a claim for intentional tort. However, the parties' arguments are unclear and it is equally unclear what remedy is sought. We note that Appellants' amended complaint included a sole count of reckless, willful, and wanton conduct. Although they included the phrase "intentional conduct," it does not appear that the amended complaint specifically raises an intentional tort claim. Regardless, the issue is irrelevant to the resolution of this appeal.
{¶15} Finally, R.D. failed to answer the complaint as a result of an apparent issue regarding service. As R.D.'s potential personal liability is an outstanding issue that has not been addressed by the trial court, the matter must be remanded for resolution of the issue.
ASSIGNMENT OF ERROR NO. 1
The lower court was incorrect in finding that the St. Clairsville Board of Education, as well as Defendants Walter E. Skaggs and Kelly Rine, did not conduct themselves in a malicious purpose, in bad faith, or in a wanton and reckless manner, such as would remove their immunity from suit. At a minimum, questions of material fact exist which preclude summary judgment in this matter.
ASSIGNMENT OF ERROR NO. 2
Separately, the lower court was incorrect in finding that political subdivision immunity applies to Plaintiffs' claim that Defendants failed to report sexual abuse pursuant to O.R.C. § 2151.421, which imposes civil liability on a school board for its, or its employees', failure to report abuse of which it knew or should have known.
{¶16} Appellants argue the trial court erroneously determined that Appellees were entitled to immunity. For ease of understanding, Appellants' arguments regarding the political subdivision (St. Clairsville) and the individual employees (Skaggs and Rine) will be addressed separately.
*498 Statutory Immunity
{¶17} In determining whether a political subdivision is entitled to immunity, a three-tiered analysis is employed. Bowman v. Canfield , 7th Dist. No. 13 MA 144, 2015-Ohio-1323, 2015 WL 1593079, ¶ 6, citing Ziegler v. Mahoning County Sheriff's Department , 137 Ohio App.3d 831, 835, 739 N.E.2d 1237 (7th Dist.2000) ; Abdalla v. Olexia , 7th Dist. No. 97-JE-43, 1999 WL 803592 (Oct. 6, 1999). The analysis begins with a presumption, "pursuant to R.C. 2744.02(A)(1), that a political subdivision is generally immune from liability for its acts and the acts and actions of its employees unless one of the exceptions enumerated within R.C. 2744.02(B) apply." Bowman at ¶ 6.
{¶18} The exceptions under the second tier include:
(1) the negligent operation of a motor vehicle by an employee who is acting within the subdivision's scope of employment and authority; (2) an employee's negligent performance of acts with respect to the subdivision's proprietary functions; (3) the negligent failure to repair public roads and negligent failure to remove obstructions from public roads; (4) negligence of employees that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function; and, (5) when a section of the Revised Code expressly imposes civil liability on the subdivision.
Id. at ¶ 7. If any of the five exceptions applies, then the political subdivision is stripped of its immunity. Id.
{¶19} The third and final tier sets out seven defenses that revive a political subdivision's immunity in the event that one of the above exceptions applies. The defenses that restore immunity are: (1) when the political subdivision or an employee of the subdivision is engaged in the performance of a judicial, quasi-judicial, prosecutorial, legislative, or quasi-legislative function at the time of the alleged injury; (2) when the injury is caused by non-negligent conduct that was required or authorized by law, or by conduct that was necessary or essential to the exercise of the subdivision's powers; (3) when the action that caused the alleged injury was within the employee's discretion by virtue of the office or position held within the political subdivision; (4) when the person whose action caused the injury was serving any portion of a sentence stemming from a criminal conviction by performing community service work within the subdivision; (5) when the injury resulted "from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources." R.C. 2744.03(A).
St. Clairsville
{¶20} Appellants contend that St. Clairsville was stripped of its immunity pursuant to R.C. 2744.02(B)(2), (B)(5). Appellants argue that St. Clairsville is not entitled to any of the five exceptions that would enable it to reclaim immunity. Specifically, Appellants argue that the mandatory reporting statute, R.C. 2151.421, requires educators and school personnel to identify and report suspected abuse. Appellants urge that the reporting requirement is proprietary in nature as it "promotes or preserves the public peace, health, safety, or welfare" and is an action customarily engaged in by nongovernment individuals. (Appellants' Brf., p. 17.) As such, Appellants contend that St. Clairsville is stripped of its immunity pursuant to R.C. 2744.02(B)(2). Additionally, Appellants argue that the State of Ohio implemented the mandate and individual schools lack discretion in adopting curriculum to comply with R.C. 2151.421. As such, Appellants *499 contend that Appellees are also stripped of immunity pursuant to R.C. 2744.02(B)(5).
{¶21} In response, St. Clairsville contends that none of the exceptions to immunity apply, here. St. Clairsville argues that R.C. 2151.421 does not impose civil liability pursuant to O'Toole v. Denihan , 118 Ohio St.3d 374, 386, 2008-Ohio-2574, 889 N.E.2d 505. Even if the statute did impose civil liability, St. Clairsville argues that Appellants did not bring any claim involving a proprietary function until they filed the amended complaint, but this was filed after the competing motions for summary judgment. Even if such claims were timely filed, St. Clairsville argues that they have discretion in terms of which policies to adopt in order to comply with the reporting statute, thus are entitled to immunity pursuant to R.C. 2744.03(A)(3).
{¶22} Although the trial court completed the immunity analysis, it noted that St. Clairsville Schools is not the proper party. In general, a plaintiff must demonstrate that a named party has the legal capacity to sue and to be sued; in other words, that the party is sui juris . Richardson v. Grady , 8th Dist. Nos. 77381, 77403, 2000 WL 1847588, *2 (Dec. 18, 2000). While the proper party, here, is technically the St. Clairsville School District, it is clear from this record that Appellants intended the St. Clairsville School District to be the party in this matter, and it is equally clear that all parties understood this intent. Thus, the fact that the word "district" was omitted does not affect this matter.
{¶23} The parties do not appear to dispute that St. Clairsville is entitled to immunity pursuant to R.C. 2744.02(A). The dispute centers around whether the school district was stripped of immunity pursuant to any of the exceptions found in R.C. 2744.02(B) and, if so, whether they reclaimed immunity pursuant to the defenses in R.C. 2744.03(A).
{¶24} The relevant R.C. 2744.02(B) exceptions include R.C. 2744.02(B)(2) and (B)(5). R.C. 2744(B)(2) strips a political subdivision when an injury is "caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions." Appellants claim that St. Clairsville was stripped of its immunity under R.C. 2744.02(B)(2) as they believe that the reporting mandate of R.C. 2151.421 is proprietary in nature. As to R.C. 2744.02(B)(5), it strips a political subdivision of its immunity when a section of the revised code imposes civil liability. According to Appellants, R.C. 2151.421 imposes civil liability.
{¶25} Both arguments advanced by Appellants center on the reporting requirements found in R.C. 2151.421. In relevant part, R.C. 2151.421(A)(1)(a) states:
No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows, or has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect, that a child under eighteen years of age, or a person, under twenty-one years of age with a developmental disability or physical impairment, has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child shall fail to immediately report that knowledge or reasonable cause to suspect to the entity or persons specified in this division.
{¶26} Pursuant to R.C. 2151.421(B), the reporting mandate:
[A]pplies to any person who is an attorney; health care professional; practitioner *500 of a limited branch of medicine as specified in section 4731.15 of the Revised Code ; licensed school psychologist; independent marriage and family therapist or marriage and family therapist; coroner; administrator or employee of a child day-care center; administrator or employee of a residential camp, child day camp, or private, nonprofit therapeutic wilderness camp; administrator or employee of a certified child care agency or other public or private children services agency; school teacher; school employee; school authority; agent of a county humane society; person, other than a cleric, rendering spiritual treatment through prayer in accordance with the tenets of a well-recognized religion; employee of a county department of job and family services who is a professional and who works with children and families; superintendent or regional administrator employed by the department of youth services; superintendent, board member, or employee of a county board of developmental disabilities; investigative agent contracted with by a county board of developmental disabilities; employee of the department of developmental disabilities; employee of a facility or home that provides respite care in accordance with section 5123.171 of the Revised Code ; employee of an entity that provides homemaker services; a person performing the duties of an assessor pursuant to Chapter 3107. or 5103. of the Revised Code; third party employed by a public children services agency to assist in providing child or family related services; court appointed special advocate; or guardian ad litem.
{¶27} Although not raised by the parties, in relevant part subsection (N) provides that "[w]hoever violates division (A) of this section is liable for compensatory and exemplary damages to the child who would have been the subject of the report that was not made." However, Ohio courts have held that this subsection does not impose civil liability on a political subdivision, such as a school district. Subsection (N) imposes liability only on individuals. See Thompson v. Buckeye Joint Vocational School Dist. , 2016-Ohio-2804, 55 N.E.3d 1, ¶¶ 21-22 (5th Dist.). Because political subdivisions are not mandated to report, civil liability cannot be imposed. Id. at ¶ 22. Thus, R.C. 2151.421 does not apply to St. Clairsville.
{¶28} Appellants next argue that St. Clairsville failed to fulfill its duties under R.C. 3319.073 which require boards of education and school districts to adopt curriculum to prevent child abuse. R.C. 3319.073(A) provides in relevant part:
The board of education of each city and exempted village school district and the governing board of each educational service center shall adopt or adapt the curriculum developed by the department of education for, or shall develop in consultation with public or private agencies or persons involved in child abuse prevention or intervention programs, a program of in-service training in the prevention of child abuse, violence, and substance abuse and the promotion of positive youth development. Each person employed by any school district or service center to work in a school as a nurse, teacher, counselor, school psychologist, or administrator shall complete at least four hours of the in-service training within two years of commencing employment with the district or center, and every five years thereafter.
{¶29} There is no evidence here that St. Clairsville did not meet these standards. The statute specifically requires that a school employee complete at least four hours of in-service training within two *501 years of obtaining employment, and every five years thereafter. Skaggs testified that all staff participates in a program called Public School Works. He stated that the presentation is an hour and one-half long. One of the teachers testified that the course must be taken once per year.
{¶30} Appellants claim that this does not satisfy R.C. 3319.073 which requires four hours of training. However, Appellants are misrepresenting the requirements of R.C. 3319.073. The statute requires four hours of training within the first two years of obtaining employment and every five years thereafter . As the program is an hour and one-half long, a teacher completing only this program would have three hours of training within their first two years, but would have seven and one-half hours within five years, which is in excess of the R.C. 3319.073 requirement. Further, the statute requires training "in the prevention of child abuse, violence, and substance abuse and the promotion of positive youth development." The Public School Works program includes training on "sexual predators, online predators, inappropriate relationships," and specifically addresses sexual grooming. Thus, the sexual abuse component of the training fulfills the requirements of R.C. 3319.073.
{¶31} Consequently, Appellants' arguments regarding St. Clairsville are without merit and are overruled.
Skaggs and Rine
{¶32} Appellants argue that Superintendent Skaggs and Athletic Director Rine were stripped of their immunity pursuant to R.C. 2744.03(A)(6)(b), (A)(6)(c). As to R.C. 2744.03(A)(6)(b), Appellants argue that Skaggs' and Rine's actions amounted to bad faith and willful, wanton, and reckless misconduct. Appellants argue that Skaggs and Rine knowingly permitted R.D. to coach with an expired coaching certificate without which R.D. would not have had access to Doe. Appellants also argue that Skaggs and Rine failed to monitor R.D.'s phone and social media accounts. Finally, Appellants contend that Skaggs and Rine failed to implement meaningful policies and reporting systems.
{¶33} In response, Skaggs and Rine state that they cannot legally monitor the staff's phones and there is nothing within R.D.'s social media accounts that would have alerted them to an improper relationship with Doe. As to the policies and reporting systems, Skaggs and Rine point out that there is some discretion in how to implement policies in order to comply with the state's reporting mandate. Even so, Skaggs and Rine argue that there was no evidence that they had any reason to suspect the abuse. Appellants' argument is based on a belief that they should have known about the abuse. However, there is no caselaw imposing liability on school employees or administrators because they "should have known" about potential abuse. In fact, caselaw has held that individual defendants cannot be liable for acts of which they had no knowledge. Here, Skaggs and Rine urge that they did not have knowledge of R.D.'s behavior until May of 2015. Once they had such knowledge, R.D. was immediately terminated.
{¶34} Willful and wanton misconduct has been defined as:
Wanton, willful and/or reckless conduct is conduct that is a degree greater than negligence. Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs. , 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 521, ¶ 37 ; Wagner v. Heavlin , 136 Ohio App.3d 719, 730-731, 737 N.E.2d 989 [7th Dist.2000]. Specifically, wanton misconduct is "the failure to exercise any care toward one to whom a duty of care is owed when the failure *502 occurs under circumstances for which the probability of harm is great and when the probability of harm is known to the tortfeasor." Id. Willful conduct involves a more positive mental state than wanton misconduct and implies intent. Id. at 731 [737 N.E.2d 989]. That intention relates to the conduct, not the result. Id. It is an intentional deviation from a clear duty or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.
DeMartino v. Poland Local School Dist. , 7th Dist. No. 10 MA 19, 2011-Ohio-1466, 2011 WL 1118480, ¶ 48.
{¶35} Generally, issues regarding wantonness and willfulness are questions for the jury. Adams v. Ward , 7th Dist. No. 09 MA 25, 2010-Ohio-4851, 2010 WL 3861142, ¶ 27. The standard of proof for such conduct is high. Id. When reasonable minds cannot conclude that the conduct at issue meets that high standard, a court may determine that such conduct is not willful or wanton as a matter of law. Id.
{¶36} The evidence before the trial court included depositions from several teachers, the Doe family, Skaggs, and Rine. K.B., a middle school teacher, testified that she did not hear of the abuse until after R.D. was terminated. (K.B. Depo., pp. 9-10, 18-19.) She testified that many softball players visited R.D.'s classroom. (K.B. Depo., p. 11.) She stated that she had not heard of the abuse from any students prior to R.D.'s termination.
{¶37} Similarly, D.B., another middle school teacher, testified that she usually hears various rumors from students but had not heard anything regarding the abuse in question. (D.B. Depo., pp. 18-19, 55.) She testified that she did not know of any teacher or student who was aware of the abuse before R.D. was terminated. D.B. testified that she is a close friend of the Doe family. At one point, she noticed that Doe seemed upset and depressed and informed Mrs. Doe. Mrs. Doe told her that she had noticed the behavior but believed it was because Doe had seriously injured her shoulder, which had caused division one schools to stop recruiting her. (D.B. Depo., pp. 46-47.) Doe's mother also mentioned that Doe began to pluck out her eyebrows. (D.B. Depo., pp. 62-63.)
{¶38} A third middle school teacher, L.F., testified that her classroom was across the hall from R.D.'s. She would routinely see various softball players visit R.D.'s room and could not say if she had ever seen Doe specifically. (L.F. Depo., pp. 9-10.) She testified that players from all sports frequently visit their coaches' classroom. L.F. testified that she had not heard any rumors involving R.D. and Doe prior to R.D.'s termination. (L.F. Depo., p. 15.)
{¶39} A fourth middle school teacher, S.S., also testified that various softball team members visited R.D.'s classroom. (S.S. Depo., p. 11.) She did state that she had complained about the presence of high school students at the middle school, however, it was not due to any concerns of inappropriate behavior nor was it directed at Doe. S.S. testified that she never observed any behavior that would have raised a red flag. She also stated that she had never heard rumors of an inappropriate relationship between R.D. and Doe.
{¶40} Michael McKeever, the middle school principle, also testified that R.D. routinely held softball team meetings in her classroom. (McKeever Depo., p. 12.) McKeever stated that he addressed the faculty as a whole to discuss high school students visiting the middle school classrooms. However, McKeever stated that this discussion was not prompted by concerns related to R.D. and Doe. McKeever *503 testified that there were four teachers who had high school ties and would often have high school students in their classrooms. (McKeever Depo., pp. 20-21.) These teachers included R.D., the other baseball coach, the choir director, and art/theater teacher. (McKeever Depo., p. 21.) He believed that there were legitimate reasons for these four individuals to have high school students in their rooms but wanted to limit the "everyday teachers' aides." (McKeever Depo., p. 22.)
{¶41} McKeever testified that the moment he had reason to suspect wrongdoing he called Doe's mother and asked her to come to the school where he and Skaggs informed her of the allegations. According to McKeever, Mrs. Doe told him that she had suspicions because Doe had recently revealed that she was homosexual or bisexual and had been spending a significant amount of time with R.D. (McKeever Depo., pp. 32-33.) McKeever testified that he had never heard from any student or staff member that there was anything inappropriate occurring between R.D. and Doe prior to this point. (McKeever Depo., p. 76.)
{¶42} Doe's testimony confirmed the teachers' testimony. She testified that there were no outward advances between her and R.D. in front of anyone or in public. (Doe Depo., p. 69.) Doe also confirmed that none of the sexual activity took place on school grounds. (Doe Depo., p. 77.) Doe further testified that Skaggs and Rine did not know of the abuse until May of 2016. She stated that she did not tell anyone about the abuse despite knowing that she could report it because she did not think Skaggs would do anything about it.
{¶43} The sole evidence that anyone had knowledge of the abuse is found in an affidavit from K.G., a former teammate of Doe. K.G. averred that she observed physical contact between Doe and R.D. and believed it was inappropriate. (K.G. Affidavit, p. 1.) However, this contradicts Doe's testimony that no outward advances occurred in front of anyone. K.G. also mentioned rumors of an inappropriate relationship, however, she did not provide any specific information about the rumors and no other witnesses had heard these supposed rumors. K.G. was not deposed.
{¶44} Rine testified that he was aware that R.D.'s coaching certificate had expired. He stated that she had met all of the necessary criteria but, for reasons involving technology, could not file the paperwork. She informed Rine that she would mail the paperwork. (Rine Depo., p. 15.) Rine stated that he had viewed R.D.'s Twitter account and it mostly consisted of scores and team results. (Rine Depo., p. 17.) He periodically viewed the account and used it to check the team's progress. Rine stated that he had no knowledge of any gifts given from R.D. to Doe. (Rine Depo., p. 28.) Rine stated that Mrs. Doe did not appear to be surprised when she learned of the allegations. (Rine Depo., p. 32.) Rine said that Mrs. Doe told him that she and her husband had suspicions regarding the relationship between Doe and R.D.
{¶45} While Appellants refer to a previous incident between a coach and student, Rine testified that this incident did not occur while that coach was employed by the school. Although details of the prior incident are not provided in the record, Rine did state that after they hired the girls' basketball coach, they learned of a prior incident that had occurred at a YMCA. (Rine Depo., pp. 19-20.) The coach was immediately terminated.
{¶46} Skaggs testified that it is normal for high school students to visit middle school classrooms when the teacher is a coach or an advisor. (Skaggs Depo., p. 22.)
*504 Skaggs noted that it was also normal for high school students to visit their former teachers for help with certain subjects. Skaggs also noted that Doe participated in a program where she took college classes for half the day during her senior year, thus she was not often at the high school.
{¶47} As to the coaching certificate, Skaggs testified that the paperwork, background check, and coaching classes had been completed and all that was missing was payment. (Skaggs Depo., p. 13.) Both Skaggs and Rine were asked about a photograph of R.D. and a softball player, presumed to be Doe, sitting in a bus, where it appeared that one of the two had a knee somewhere in the vicinity of the other's crotch. Skaggs explained that he learned of the abuse when a superintendent from another school called him and informed him of the photograph. (Skaggs Depo., p. 67.) Both Skaggs and Rine said they had never seen the photograph until the allegations arose. Even so, Skaggs said that from the photo it is impossible to tell whether this was prolonged or incidental touching and there is no evidence of who might have observed the interaction. (Skaggs Depo., p. 55.) Doe was confronted and confirmed that abuse had taken place. He said R.D. was terminated immediately after Doe confirmed the abuse.
{¶48} According to Mrs. Doe, Doe visited R.D.'s house at least twice a week. (Mrs. Doe Depo., p. 44.) Mrs. Doe stated that she asked Doe why she spent so much time at R.D.'s house. Doe responded that it was related to college recruitment. Mrs. Doe testified that Doe asked her several times to spend the night at R.D.'s house. She conceded that the school had no knowledge of this fact. (Mrs. Doe Depo., p. 25.) Mrs. Doe testified that R.D. took Doe on a college visit to Ashland University, her alma mater, during Doe's freshman year and Doe came back agitated and did not want to attend Ashland. (Mrs. Doe Depo., p. 27.) Mrs. Doe stated that R.D. arrived with flowers the day after Doe's shoulder surgery. (Mrs. Doe Depo., p. 46.) Mrs. Doe testified that Doe has had a cell phone since at least age 15 and she did not monitor her daughter's phone. Mrs. Doe said she printed out all of the text messages after the allegations were revealed and conceded that this was the first time the school knew of the messages. (Mrs. Doe Depo., p. 70.)
{¶49} She also admitted that she never told Skaggs, Rine, or anyone else associated with the school about the gifts R.D. gave to Doe. (Mrs. Doe Depo., p. 73.) She became concerned when R.D. purchased an expensive outfit for Doe for Christmas but did not inform the school about the gift. (Mrs. Doe Depo., pp. 75-76.)
{¶50} Mrs. Doe stated that Doe had seemed depressed and had "not been herself." (Mrs. Doe Depo., p. 36.) She also noticed that Doe had begun to pluck out her eyebrows. (Mrs. Doe Depo., p. 77.) Doe told her that R.D. had bought her a necklace-like chain to rub when she became upset instead of plucking her eyebrows. Mrs. Doe thought the gift was inappropriate but did not inform the school. (Mrs. Doe Depo., p. 78.) Mrs. Doe admitted that she found an LGBT t-shirt in Doe's bedroom shortly before the allegations were revealed and told her that it was unacceptable. Doe began crying and said she needed help. (Mrs. Doe Depo., p. 36.) Mrs. Doe admitted that she informed McKeever at the meeting that she had concerns about her daughter's sexuality prior to learning of the abuse. (Mrs. Doe Depo., p. 86.)
{¶51} According to Mrs. Doe, she informed a board of education member that R.D. was instrumental in helping Doe recover from her injuries and handle college recruitment but did not mention the gifts or home visits. Mrs. Doe stated that she *505 was complimentary of R.D. and did not voice any complaints or concerns. (Mrs. Doe Depo., p. 33.) Mrs. Doe admitted that she did not tell any school representative about the visits or gifts. (Mrs. Doe Depo., p. 34.) Contrary to the teachers' testimony, Mrs. Doe testified that she believed teachers had observed inappropriate conduct. (Mrs. Doe Depo., pp. 55-56.)
{¶52} Mr. Doe testified that he was unaware of anyone who knew of the abuse before the allegations were revealed. (Mr. Doe Depo., p. 47.) Mr. Doe stated that the school was never informed of any of the gifts given from R.D. to Doe.
{¶53} The record is devoid of any evidence to demonstrate that Skaggs or Rine had any reason to know of the abuse prior to receiving the incriminating photo. Mr. and Mrs. Doe admitted that they never informed anyone at the school about Doe's visits to R.D.'s house, the gifts, or about Doe's depression. None of the teachers who testified observed any red flags and had not heard any rumors from students.
{¶54} Appellants contend that the school's announcement regarding high school students visiting the middle school was directed at Doe. However, several teachers testified that many athletes and former students routinely visited the middle school. As such, no one found her visits to be out of the ordinary. Further, the middle school principle testified that the announcement did not bar high school students from being present at the middle school. Instead, it was aimed at prohibiting high school students from becoming middle school teachers' aides. He testified that an athlete visiting a coaches' classroom would not have been in violation of any rule.
{¶55} As to Appellants' argument regarding the failure to monitor cellphones and social media accounts, there is no legal mechanism to allow the school to confiscate either R.D. or Doe's phone to read their text messages. Rine testified that he routinely checked R.D.'s Twitter account for updates on scores and statistics. There is no evidence that anything posted to her Twitter account would have alerted anyone to an improper relationship. Appellants argue that Doe is in the center of every photograph posted to the account. Although the photos are not a part of the appellate record, they are described in several depositions and sound like team pictures. While Doe is apparently in the center of many photographs, she was regarded as the star of the team. There is no evidence that R.D. placed her in the middle or that her position in the middle of a photograph had any significance.
{¶56} Again, the photograph of Doe and R.D. in the school bus is not a part of the appellate record. In the depositions, the photograph is described as grainy, however, R.D. is apparently observable in the photograph. The other girl is assumed to be Doe although her face is not visible. Doe's father said he assumed it was Doe from what he was told, but could not say for certain that it was his daughter. Other than the unorthodox position of the persons depicted, there is no further evidence of record regarding this photo. It is unknown who took the photograph. Apparently someone in another school district provided the photograph to that district's superintendent who informed Skaggs of its existence. It is also unknown whether anyone on the bus saw R.D. and Doe at or around the time the photo was taken. Appellants claim that the bus driver was in a position to see the conduct, however, the record is devoid of any information as to whether the bus driver may have seen anything inappropriate. Further, it is unknown whether the contact was accidental or whether it was sexually motivated.
*506 {¶57} We note that at least one of the teachers believed Doe seemed upset. However, this information was directly provided to Doe's parents, who already knew she had been depressed. In fact, it was Doe's mother who said she knew Doe was plucking out her eyebrows. Doe's mother told the teacher that the depression was caused by Doe's serious shoulder injury which was affecting her dream of playing division one softball.
{¶58} Based on this record, there is no evidence any red flags were readily observable by anyone in the school. Although Doe's parents knew of the frequent trips to R.D.'s house, the gifts, Doe's depression, and the closeness between R.D. and Doe, none of this information was provided to the school. Importantly, none of the sexual encounters occurred on school grounds. Even if the proper standard is whether Appellees should have known of the abuse, there is no evidence that would have triggered any suspicions regarding abuse. Accordingly, neither Skaggs nor Rine were stripped of their immunity pursuant to R.C. 2744.03(B)(6)(b).
{¶59} Next, it must be addressed whether Skaggs and Rine were stripped of immunity pursuant to R.C. 2744.03(A)(6)(c), based on their failure to comply with the mandatory reporting statute. Again, the reporting statute is outlined in R.C. 2151.421. The statute imposes a mandatory duty on select individuals, including teachers, superintendents, and other school employees, to report any abuse that he or she "knows, or has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect." R.C. 2151.421(A)(1)(a).
{¶60} According to Appellants, Skaggs and Rine are stripped of their immunity because R.C. 2151.421(N) imposes civil liability on individuals who fail to comply with the mandated reporting statutes. Appellants are correct that R.C. 2151.421(N) imposes civil liability on individuals who fail to comply with the reporting statute. "Whoever violates division (A) of this section is liable for compensatory and exemplary damages to the child who would have been the subject of the report that was not made." R.C. 2151.421(N). Skaggs and Rine argue that the Ohio Supreme Court held that R.C. 2151.421(N) does not impose civil liability for purposes of sovereign immunity in O'Toole, supra . However, this is not the holding reached by the O'Toole Court. Instead, the Court held that R.C. 2919.22, a child endangering statute, did not impose civil liability for purposes of sovereign immunity. Id. at ¶ 69. In regard to R.C. 2151.421, the Court held that the defendant did not have a duty to report pursuant to subsection (A), thus was not stripped of immunity pursuant to R.C. 2744.03(B)(6)(c). Id. at ¶ 61.
{¶61} R.C. 2151.421 only imposes a duty to report suspected abuse. This section is silent about enacting reporting policies. That duty is found in R.C. 3319.073, which applies to the school district, not Skaggs and Rine as individuals. Civil liability pursuant to R.C. 2151.421 only attaches when the duty to report abuse is violated. There is no evidence in this record that Skaggs or Rine had any reason to suspect the abuse.
{¶62} Accordingly, Appellants' assignments of error are without merit and are overruled.
Conclusion
{¶63} Appellants argue that the trial court erroneously ruled that Appellees were entitled to immunity. However, there is no evidence that Appellees had reason to suspect the abuse, thus they retained their immunity. As such, Appellants' arguments are without merit and the judgment of the *507 trial court is affirmed. The matter is remanded solely to address R.D.'s potential personal liability.
Robb, P.J., concurs.
Donofrio, J., concurs.