[Cite as *Mullins v. Liberty Twp.*, 2022-Ohio-4350.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

WILBERT MULLINS ET AL.,

Plaintiffs-Appellants,

v.

LIBERTY TOWNSHIP ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0023**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2021 CV 252

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. John A. McNally, III,* John A. McNally, III, Co., LPA, 100 East Federal Street, Suite 600, Youngstown, Ohio 44503, for Plaintiffs-Appellants and

*Atty. Mel L. Lute, Jr.,* Baker, Dublikar, Beck, Wiley & Mathews, 400 South Main Street, North Canton, Ohio 44720, for Defendants-Appellees.

Dated: November 30, 2022

**D'Apolito, J.**

{¶1}  Appellants, Wilbert Mullins ("Mullins") and Sherry C. Mullins ("Sherry") (collectively "Mullinses"),appeal the entry of summary judgment based on sovereign immunity by the Mahoning County Court of Common Pleas in favor of Appellees, Liberty Township and Liberty Township Police Officer No. 1 John Doe ("John Doe officer") in this action alleging negligence and loss of consortium.  The trial court found that the political subdivision was immune from liability because the police officer, sued in his official capacity, was performing a governmental function when Leo, a certified police canine with the Liberty Township Police Department, jumped on Mullins, causing Mullins to fall to the ground, and allegedly bit him. For the following reasons, the judgment entry of the trial court is affirmed.

## FACTS

{¶2}  Mullins is a former United States Marine, and a captain and thirty-year veteran of the Youngstown Fire Department.  He is 5'11 and weighs 230 pounds. Through his employment with the fire department, Mullins has occasionally worked fire scenes where police canines were present, but never encountered one as a part of his job.

{¶3}  Mullins testified at his deposition that he has an apprehensiveness around dogs, particularly large dogs, based on "the aggressiveness of them" and "how they – they have to be restrained."  (Deposition of Wilbert Mullins, p. 21.)  Mullins further testified that when his neighbors, who own large dogs, walk their dogs along the street toward his property, he "immediately go[es]to [his] backyard or [he] go[es] to the front porch and lock[s] the gate."  (*Id.*, p. 24.)

{¶4}  Officer David Rankin is a certified canine handler with the Liberty Township Police Department.  Liberty Township is located in Trumbull County.  While on routine patrol in Liberty Township, with Leo on March 4, 2020, Officer Rankin observed a red truck with a loud exhaust, so he initiated a traffic stop.

{¶5}  The red truck continued a short distance into the city of Youngstown, which is located in Mahoning County.  The red truck stopped on Upland Avenue, roughly two

blocks south of Gypsy Lane.   Liberty Township Police Officer Robert Altier heard the dispatch call and travelled to the scene to assist Officer Rankin.

{¶6}   While running the identification information of the driver and the passenger of the red truck, Officer Altier recognized the name of the passenger, Clifford Wright, as an individual with three outstanding felony warrants and an open case in Trumbull County. Officer Altier then observed Wright exit the passenger side of the red truck.

{¶7}   Although Officer Altier commanded Wright to return to the vehicle, Wright fled up Upland Avenue.  Officer Rankin shouted, "[d]og out," in order to alert Officer Altier that Leo was being released from the cruiser, and Leo exited the police cruiser and began his pursuit of Wright.  Leo and Officers Altier and Rankin chased Wright into the backyard of 922 Upland Avenue, where Mullins and Sherry reside.

{¶8}   In an affidavit filed in support of his opposition brief to the motion for summary judgment, Mullins provided the following summary of events:

> In my back yard finishing grilling with my kids.  The officer and his dog were chasing a person up my driveway.  I told the officer the person went over the fence. He stated something to the dog in a foreign language and the dog attacked me, knocking me down, biting my face.  He pulled the dog back by his back legs while I was pushing him off me.
>
> He yelled at me to stay in the damn shed.  I could hear him giving the dog commands while I was holding the doors closed from the inside and the dog shaking [sic] the doors of the shed trying to get in.  Once I invited him in to tell him what the dog did to my face, he showed no concern for my wellbeing, only stating that the dog had his shots.  He never had control of the situation or the dog.  I had just took [sic] my daughter in the house 15 minutes prior, thank goodness, cause [sic] she is disabled and in a wheel chair.[1]

(Affidavit of Wilbert Mullins, ¶ 4.)

---

[1] Mullins's daughter Malissa is non-verbal and in a wheelchair.  She is unable to move from her wheelchair to her bed without assistance, and requires assistance with mobility.

{¶9} Mullins provided a more detailed account of the events leading to his alleged injuries at his deposition. There is no garage on Mullins's property. An eight-foot fence surrounds the entire perimeter of the backyard, with a single gate at the top of the driveway.

{¶10} Mullins was cleaning the grill and backyard after having prepared a meal for his family including Sherry, their three daughters, and six grandchildren, when he heard multiple sirens coming from the direction of Gypsy Lane. He then observed a Liberty Township police cruiser initiate a traffic stop in front of his residence on Upland Avenue.

{¶11} Mullins described the time of day as "kind of twilight." (Mullins Depo., p. 28.) The backyard was well lit due to a large area light mounted by the door on Mullins's property, as well as similar fixtures which cast light from the neighboring properties.

{¶12} Mullins resumed his tasks and entered a plastic 8' x 10' shed on his property where he stored his grilling utensils. While in the shed, which provides a direct vantage point down the driveway, Mullins heard the sound of labored breathing and saw Wright running up his driveway, followed by a police officer, Leo, and a second police officer. Mullins believed that Wright intended to enter the shed, so Mullins "flagged him off." (*Id.*, p. 34.) Leo was "about halfway up [Mullins's] driveway" when Mullins confronted Wright at the shed entry. (*Id.*, p. 39.)

{¶13} Instead, Wright ran into Mullins's backyard, climbed over the perimeter fence, and fled down the driveway of the neighboring residence onto Outlook Avenue, the street between Gypsy Lane and Upland Avenue. Leo narrowly missed apprehending Wright as Wright cleared the fence. After Wright disappeared, Leo sat at the base of the fence.

{¶14} While standing in the doorway of the shed, Mullins shouted to the officer, "he went over the fence!" Mullins heard the police officer give Leo a command in a foreign language. Then Leo ran the roughly seven feet from the fence to the doorway of the shed then lunged at Mullins.

{¶15} Leo's upper teeth made contact with Mullins's face above his left eye and Leo's lower teeth made contact with the roof of Mullins's mouth. Mullins conceded that his eyeglasses remained not only in tact but also in place during the alleged bite to his face. (*Id.*)

{¶16} Leo's "whole body" was on Mullins, which caused Mullins to fall backwards into the shed onto various objects located on the floor of the shed. The shed contained "various tools, rakes, shovels, [a] cast iron stove, just regular gardening equipment," and two adult bikes. (*Id.*, p. 46.) Mullins struck his head on the cast iron stove.

{¶17} The police officer pulled Leo away from Mullins by grabbing Leo's back legs, while Mullins pushed Leo off with his right arm. The police officer was "screaming" at Leo. Based on their combined efforts, Mullins was able to separate himself from Leo and close the shed doors.

{¶18} However, Leo escaped the officer's grasp and "came at [Mullins] again." (*Id.*, p. 48.) As Leo was "growling and barking and clobbering [sic] at the door as [Mullins] was holding it," Mullins heard the officer speaking in a foreign language. (*Id.*, p. 49.) The officer twice commanded Mullins to "stay in the damn shed." (*Id.,* p. 50.)

{¶19} Mullins remained in the shed for roughly ten minutes because he was "terrified." When Mullins slowly opened the doors and determined that Leo was "still there," the officer was still speaking to Leo in the foreign language. Mullins quickly removed himself to the back door of the residence.

{¶20} According to the officers, Mullins was in the shed when they entered his backyard and they instructed him to stay there. He initially complied, closing the shed doors behind him, then opened the doors suddenly and emerged from the shed. As a result, Leo lunged at Mullins, making contact with him and causing Mullins to fall backwards into the shed. Both officers attested that they did not see Leo bite Mullins.

{¶21} The officers and Leo then resumed their pursuit of Wright, which led them through a fence and several neighboring yards. Leo ultimately apprehended Wright in a garage.

{¶22} Officer Rankin did not observe any injuries on Mullins consistent with a police canine apprehension bite. According to Officer Rankin, Leo is trained to bite suspects in specific locations to maximize his effectiveness, but he was never trained to bite a suspect's face. Officer Rankin further averred that "[a]t no time was [Leo] either not under a leash or an electronic collar." (*Id.*, ¶ 20.)

{¶23} When Sherry saw Mullins enter the residence, she began to cry and insisted that he go to the hospital because his face was bleeding. Mullins testified that he was "in

shock." (Mullins Depo. at p. 51.) Later in his testimony, Mullins stated that blood was coming from his eye and that he could taste blood in his mouth.

{¶24} According to Mullins, the officer aggressively entered the residence with a flashlight and appeared to be searching for the assailant. Mullins informed the officer that he had been bitten by Leo. The officer responded that Leo had "all his shots." (*Id.*) The conversation between the two men lasted roughly five to ten minutes.

{¶25} Mullins drove himself to the main campus of St. Elizabeth's Hospital in downtown Youngstown. He was there for a little more than an hour and was given prescriptions for narcotic pain medication (codeine) and an antibiotic.

{¶26} Next, Mullins drove himself to the Liberty Township Police Department to file a complaint. Initially, Mullins was questioned by the officer from the scene. When Mullins asked the officer why the dog did not follow the commands of the officer at the scene, the John Doe officer responded, "because sometimes the dog doesn't hear me." Realizing that the officer questioning him was the canine officer from the scene, Mullins immediately terminated the interview and asked to speak to the canine officer's supervisor.

{¶27} Sergeant Chad McGarry, the canine officer's supervisor, informed Mullins that "[Mullins] just got a half bite." (*Id.,* p. 59.) The supervisor continued, "[y]ou ought to see what he did to the guy when he caught him. He chewed up his left shoulder." (*Id.*) The supervisor also informed Mullins that Wright lived a few blocks from Mullins's residence, and Wright was trying to run to his house in order to elude the police. According to McGarry's affidavit, he observed no injuries to Mullins's face or right arm, the locations where Mullins claimed to have been bitten by Leo.

{¶28} Mullins did not work several shifts at the fire department due to severe, lingering pain in his back and left knee. He did not return to work for fifteen months because he "was not healed physically and mentally able to perform his duties as a fire captain" during that time. (Mullins Depo., p. 62.)

{¶29} Mullins returned to work "because [he] ran out of sick time, and [he] would not have gotten any monies to pay [his] bills. So [he] had – pretty much was forced to go back to work." He explained that he had previously called off from work four times in thirty years. Mullins was required to provide documentation from his psychiatrist and medical

doctor stating the reasons for his injuries and explaining the treatment he was receiving in order to continue collecting his salary.

**{¶30}** Mullins testified that he received no ongoing medical treatment for his alleged back injury, but at the end of March he began physical therapy for both his back and left knee, which continued for three months. Mullins underwent "needle therapy"[2] to address the pain in his left knee, which was not successful. As a consequence, in November of 2020, he underwent arthroscopic surgery to repair a torn meniscus in his left knee. Mullins conceded that no physician had opined that the encounter with Leo was the cause of Mullins's meniscal tear.

**{¶31}** Mullins testified that he is no longer able to perform certain activities following his encounter with Leo, which include cycling, walking, and weightlifting. He also struggles to help Sherry with Malissa. Her care is the predominant reason that he aspired in the past to stay in peak physical condition.

**{¶32}** Mullins began treating his mental problems roughly two weeks after the encounter with Leo, when he noticed that he became "sweaty and clammy" when he watched the neighbors walking their dogs. Further, when he watched police shows that featured aggressive dogs, he would have to change the channel. As of the date of the deposition, Mullins continued to attend weekly psychiatric appointments.

**{¶33}** Mullins testified that he intended to retire with 33 years of service, but was forced to retire with only 30 years due to his injuries and the fact that he was currently stationed on the east side. Mullins explained the east side contains all of the city's housing projects, (*Id.,* p. 63), and "[n]obody likes [station 6] for that reason * * * [because] [y]ou get all these canine incidents." (*Id.,* p. 71.)

**{¶34}** The Mullinses filed their three-count complaint on February 9, 2021 against Liberty Township and the John Doe officer. The complaint was never amended to name the John Doe officer.

**{¶35}** In Count One, the complaint alleges that Mullins was attacked by a police dog under the control of Liberty Township and the John Doe officer. Count One further

---

[2] "Dry needling therapy" is a form of acupuncture and a treatment for osteoarthritis in the knee. When successful, the procedure reduces pain and disability and can increase arterial pressure around the knee by up to forty percent.

reads, "[i]n addition to negligence, [the John Doe officer]'s acts and/or omissions were willful, reckless, and/or were with a malicious purpose, in bad faith, and/or in a wanton or reckless manner." Complt., ¶ 8. Despite the foregoing allegations against the John Doe officer in the complaint, Mullins's counsel warranted at oral argument that the claims in Count One are predicated exclusively upon the officer's negligent supervision of Leo, and Mullins is not alleging that Leo reacted to an intentional act of provocation by the John Doe officer.

{¶36} In Count Two, the complaint asserts that Liberty Township and the John Doe officer are strictly liable for Mullins's injuries pursuant to R.C. 955.28(B), a statute that imposes strict liability on owners for the injuries proximately caused by their dogs. In Count Three, Sherry advances a claim for loss of consortium.

{¶37} Liberty Township and the John Doe officer filed their motion for summary judgment on the basis of sovereign immunity on December 15, 2021. The Mullinses filed their opposition brief on January 28, 2022. Liberty Township and the John Doe officer filed their reply brief on February 4, 2022. The Mullinses filed a surreply on February 10, 2022.

{¶38} In the motion for summary judgment, Liberty Township and the John Doe officer argue a claim for damages against an employee in his official capacity is the equivalent of a claim against the political subdivision itself and is governed by R.C. 2744.02(A) and (B). Next, they argue that Liberty Township is immune from liability pursuant to R.C. 2744.02(A) as it is a political subdivision, and the provision of police services is a governmental function. Liberty Township and the John Doe officer further argue that no R.C. 2744.02(B) exception to the grant of general immunity in R.C. 2744.02(A) applies, insofar as the John Doe officer was performing a governmental, rather than a proprietary, function. Finally, they assert that no liability is imposed on political subdivisions in R.C. 955.28.

{¶39} In the opposition brief, the Mullinses assert that "any alleged statutory immunity of the Defendant Police Department [which was not named in the complaint] and its officers were [sic] waived" based on the following alleged facts:

1. Failure to announce that a dog was being released (citing [Liberty Township Police] Manual 309.2.1[3]).

2. Failure to keep the dog under control (citing Mullins's affidavit)

3. Leo jumped at Mullins (citing Rankin Aff., ¶ 17).

4. Leo made contact with Mullins at about the knee-high level (citing Altier Aff., ¶ 12).

5. While Leo allegedly may not have been trained to bite people in the face, he did just that (citing Mullins's affidavit, which, contrary to the assertion in his opposition brief, does not have photographs attached).

6. While much has been discussed about biting about the eye, Mullins has alleged other injuries to him, proximately caused by Leo (Mullins Aff., ¶ 5-6).

(Opposition Brf., p. 4.) The Mullinses further assert that "[a]s to issues of immunity, applying them to the facts of this case would deprive Plaintiffs of due process and equal protection of laws." (*Id.*)

{¶40} The Mullinses argue in their opposition brief that the Township is liable under R.C. 2744.02(B) for the following reasons:

(a) This case involves the mishandling of a police dog by a Township Employee;

(b) Outside the Statutory limits of the police subdivision;

(c) With violations of the Police Manual.

---

[3] Although Mullins's affidavit alleges violations of Liberty Township's Police Manual, and cites large passages from the manual, he did not attach a copy of the manual to his opposition brief in violation of Civ. R. 56(E). See *Target Nat'l Bank v. Loncar*, 7th Dist. (Mahoning) No. 12 MA 0104, 2013-Ohio-3350, ¶ 8 ("'Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit.' *Id.* This requirement is satisfied by a statement in the affidavit declaring that the documents attached are true copies.")

(*Id.*) Finally, the Mullinses argue that R.C. 955.28 imposes strict liability against the owner of a dog for injury or loss proximately caused by the dog.

**{¶41}** On February 24, 2022, the trial court entered summary judgment in favor of Liberty Township and the John Doe officer for the reasons stated in the motion for summary judgment. This timely appeal followed.

## STANDARD OF REVIEW

**{¶42}** An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

**{¶43}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293, 662 N.E.2d 264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

**{¶44}** The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories,

written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327, 364 N.E.2d 267.

## **SOVEREIGN IMMUNITY**

**{¶45}** The availability of immunity is a question of law properly determined by the court prior to trial. *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992); *Hall v. Ft. Frye Local School Dist. Bd. of Edn.*, 111 Ohio App.3d 690, 694, 676 N.E.2d 1241 (4th Dist.1996). The burden of proof is initially on the political subdivision to establish general immunity, and when established, the burden then shifts to the plaintiff to demonstrate one of the exceptions to immunity applies. *Horen v. Bd. of Edn. of Toledo Pub. Schools*, 6th Dist. Lucas No. L-09-1143, 2010-Ohio-3631, ¶ 33; *Ramey v. Mudd*, 154 Ohio App.3d 582, 798 N.E.2d 57, 2003-Ohio-5170, ¶ 16 (4th Dist.)

**{¶46}** The determination of whether a political subdivision is immune from liability involves a three-tiered analysis. The first tier requires a determination of whether the political subdivision is generally immune from liability because the alleged negligent acts of its employee occur in connection with a governmental or proprietary function pursuant to R.C. 2744.02(A).

**{¶47}** If general immunity exists, the second tier provides five exceptions to immunity, which are listed in R.C. 2744.02(B). *Doe v. Skaggs*, 2018-Ohio-5402, 127 N.E.3d 493, ¶ 18 (7th Dist.). The R.C. 2744.02(B) exceptions include:

> (1) the negligent operation of a motor vehicle by an employee who is acting within the subdivision's scope of employment and authority;
>
> (2) an employee's negligent performance of acts with respect to the subdivision's proprietary functions;
>
> (3) the negligent failure to repair public roads and negligent failure to remove obstructions from public roads;

Case No. 22 MA 0023

(4) negligence of employees that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function; and,

(5) when a section of the Revised Code expressly imposes civil liability on the subdivision.

*Bowman* at ¶ 7.

**{¶48}** If one of these exceptions is found to apply, the political subdivision loses its immunity. *Id.* However, immunity may be restored after an analysis of the third tier, set forth in R.C. 2744.03(A).

## ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANT-APPELLEE, LIBERTY TOWNSHIP, ET AL.; LEGALLY[.]**

**{¶49}** Having reviewed the evidence in this case, we find that Liberty Township is entitled to the grant of general immunity from liability for Mullins's injuries under the first tier of the sovereign immunity analysis. First, there is no dispute that Liberty Township is a political subdivision. Second, the John Doe officer was pursuing a suspect when Leo encountered Mullins in Mullins's backyard.

**{¶50}** The exercise of law enforcement is a governmental function. R.C. 2744.01(C)(1)(i). Further, R.C. 2744.01(C)(2)(i) reads, in relevant part: "A governmental function includes, but is not limited to, the following: * * *[t]he provision * * * of police * * * services." Last year, the Ninth District Court of Appeals recognized that "the operation of a police department and the maintenance, care, training, harboring, and deployment of a police dog" is a governmental function. *Callaway v. Akron Police Dept.*, 9th Dist. No. 29852, 2021-Ohio-4412, 183 N.E.3d 1, ¶ 12.

**{¶51}** We further find that none of the exceptions to the grant of general immunity have been established in this case. More specifically, we reject Mullins's argument that

Case No. 22 MA 0023

civil liability is expressly imposed upon political subdivisions and their canine handlers for injuries proximately caused by certified police canines.

{¶52} R.C. 2744.02(B)(5) reads, in its entirety:

In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code, including, but not limited to, sections 2743.02[4] and 5591.37[5] of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision, because that section provides for a criminal penalty, because of a general authorization in that section that a political subdivision may sue and be sued, or because that section uses the term "shall" in a provision pertaining to a political subdivision.

{¶53} R.C. 955.28, captioned "Dog may be killed for certain acts; owner liable for damages," reads, in pertinent part, "The owner, keeper, or harborer of a dog is liable in damages for any injury, death, or loss to person or property that is caused by the dog * * *." R.C. 955.28(B).

{¶54} We have previously opined that the strict liability provision in R.C. 955.28(B) does not fall within the ambit of R.C. 2744.02(B)(5), as R.C. 955.28 is a general liability statute and does not expressly impose civil liability on political subdivisions. *In re T.B.Y. v. Martins Ferry*, 7th Dist. No. 16 BE 0002, 2016-Ohio-8482, 78 N.E.3d 242, ¶ 48; see also *Callaway, supra,* at ¶ 15; *Jamison v. Stark Cty. Bd. of Commrs.*, 5th Dist. Stark No. 2014CA00044, 2014-Ohio-4906, 2014 WL 5586143, ¶ 18; *Perry v. East Cleveland*, 11th Dist. No. 95-L-111, 1996 WL 200558 (Feb. 16, 1996).

---

[4] R.C. 2743.02 codifies the state's waiver of immunity to be sued in the Court of Claims.
[5] R.C. 5591.37, captioned "noncompliance" reads, in its entirety, "Negligent failure to comply with section 5591.36 of the Revised Code shall render the county liable for all accidents or damages resulting from that failure."

**{¶55}** Next, as Mullins failed to establish that Liberty Township and the John Doe officer lose their immunity in the second tier of the analysis, we need not undertake the third tier analysis.

**{¶56}** Finally, Mullins's counsel asserted at oral argument that Liberty Township is not immune from liability because the alleged negligent acts occurred outside of Trumbull County. At oral argument, Mullins's counsel conceded that there is no section of the sovereign immunity statute that strips a municipality of its sovereign immunity where the employee's conduct occurs outside of the municipality. Appellant's counsel further conceded the John Doe officer had the authority to pursue Wright into Mahoning County and arrest him.

**{¶57}** Accordingly, we find that Liberty Township is a political subdivision and the John Doe officer was performing a governmental function when Leo encountered Mullins. Because Mullins has not established any of the exceptions to the general grant of immunity, we further find that Mullins's sole assignment of error has no merit and affirm the entry of summary judgment by the trial court in favor of Liberty Township and the John Doe officer in his official capacity.

Waite, J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**